*Florida Administrative Code*

Chapter:

## 33-601.800 Close Management.

(1) Definitions.

(a) Housing supervisor - a correctional officer sergeant, or above, who is in charge of the close management unit for a particular shift.

(b) Medical Staff - a health care professional whose primary responsibility is the provision of physical health care to inmates.

(c) Mental Health Staff - a health care professional whose primary responsibility is the provision of mental health care to inmates.

(d) Close Management (CM) - the confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others.

(e) Close Management Levels - the three individual levels (CMI, CMII, and CMIII) associated with close management, with CMI being the most restrictive single cell housing level and CMIII being the least restrictive housing of the three CM levels.

(f) Individualized Service Plan (ISP) - a dynamic, written description of problems, goals, and services which is developed and implemented by the multi-disciplinary services team (MDST) and the inmate. An ISP shall be developed and implemented for each CM inmate who suffers from mental impairment or is at significant risk for developing such impairment, as determined by mental health staff.

(g) Multi-disciplinary Services Team - a team of mental health, program, classification, and security staff which assesses behavioral risk for each CM inmate and develops and implements an individualized service plan for each CM inmate who suffers from mental impairment or is at significant risk for developing such impairment, as determined by mental health staff.

(h) Critical Event - inmate involvement, after the CM team decision, in one or more of the following events or behaviors: assignment to suicide observation status; homicide; attempted homicide; escape; attempted escape; physical assault; attempted physical assault.

(i) Review - where used herein, refers to the evaluation of pertinent information or documentation concerning an inmates close management status to determine if changes or modifications are required or recommended.

(j) Visit - where used herein, refers to the official tour and inspection of a close management unit by a staff member.

(k) Institutional Classification Team (ICT) - the team consisting of the warden or assistant warden, classification supervisor, chief of security, and other members as necessary when appointed by the warden or designated by rule. The ICT is responsible for making work, program, housing and inmate status decisions at a facility and for making other classification recommendations to the State Classification Office (SCO). At private facilities, the Department of Corrections representative is to be considered a fourth member of the ICT when reviewing all job/program assignment, transfer, and custody recommendations/decisions. If a majority decision by the ICT is not possible, the decision of the Department of Corrections representative is final. The only exception to the above listed membership of the ICT is the makeup of the ICT at the designated CM facilities when considering the placement, continuance, modification, or removal of inmates from close management units. For these purposes, multiple ICTs consisting of the following members can be utilized:

1. Warden, a chief of security or a correctional officer with a rank and position no less than CM housing lieutenant, and the classification supervisor or a senior classification officer who does not have the inmate on his or her caseload; or

2. Assistant Warden for Operations, a chief of security or a correctional officer with a rank and position no less than CM housing lieutenant, and the classification supervisor or in his or her absence from the institution the acting classification supervisor; or

3. Assistant Warden for Programs, a chief of security or in his or her absence from the institution the acting chief of security, and the classification supervisor or a senior classification officer who does not have the inmate on his or her assigned caseload.

(l) Institutional Classification Team Docket - the official record of an ICT hearing.

(m) Major Rule Violation - any assault, battery or attempted assault or battery; any intentional lewd or lascivious exhibition in the presence of staff or visitors; any spoken or written threat towards any person; inciting, attempting to incite or participating in any riot, strike, mutinous act or disturbance; fighting; possession or trafficking of weapons, ammunition, explosives, cell phones, unauthorized drugs, escape paraphernalia, or any other item that presents a threat to the safe and secure operation of the institution; and any escape or escape attempt.

(n) Offender Based Information System (OBIS) - the departments computer offender database system which is utilized to organize and store security, classification, program and other offender information.

(o) Restricted Labor Squad - an armed supervision work squad consisting of individually shackled close management II or III inmates who work outside the secure perimeter on institution grounds.

(p) Senior Correctional Officer - a correctional officer lieutenant or above.

(q) State Classification Office (SCO) - the office or office staff at the central office level that is responsible for the review of inmate classification decisions. Duties include approving, disapproving, or modifying ICT recommendations.

(r) Lewd or Lascivious Exhibition - An inmate commits a lewd or lascivious exhibition when the inmate:

1. Intentionally masturbates;

2. Intentionally exposes the genitals without authorization; or

3. Intentionally commits any other sexual act that does not involve actual physical or sexual contact with the victim, including, but not limited to, sadomasochistic abuse, sexual bestiality, or the simulation of any act involving sexual activity in the presence of a staff member or volunteer.

(s) Security Threat Group (STG) - refers to formal or informal ongoing inmate/offender groups, gangs, organizations, or associations consisting of three or more members who have:

1. A common name or common identifying signs, colors, or symbols;

2. Members or associates who individually or collectively engage in or have engaged in a pattern of gang activity, criminal activity, or Department rule violations; or

3. Potential to act in concert to pose a threat or potential threat to the public, staff, visitors, other inmates or offenders, or the secure and orderly operations of an institution, probation office, other Department property, or Department activity or function.

(2) Levels of Close Management.

(a) Close Management I (CMI).

1. Close Management I is the most restrictive single cell housing level of all the close management status designations.

2. An inmate assigned to CMI will be ineligible for a work assignment. An inmate may be placed in CMI without having previously been in CMII or III. Any of the following factors constitutes a basis for placement of an inmate in CMI status:

   a. An incident causing death;

   b. An act causing injury or an act which could have resulted in injury to another;

   c. Any physical assault or battery on staff which caused injury;

   d. The taking of a hostage or an attempt to take a hostage;

   e. Instigation or incitement of a riot or disorder;

   f. Creating or causing property damage in excess of $ 1,000;

   g. Participation in or causing further institutional disruption during a riot or disorder;

   h. An escape or escape attempt involving use of a weapon, outside assistance, use of equipment or tools to penetrate a secure perimeter or violence committed during or while on escape;

   i. An escape or escape attempt from a secure perimeter;

   j. An escape or escape attempt while under armed supervision while outside the perimeter of the institution;

   k. Possession of weapons, ammunition, explosives, flammables, or initiation of or participation in trafficking of these items or trafficking in drugs;

   l. Participation in a sexual assault or battery;

   m. An inmate who is currently CMII or CMIII and shows an inability to adjust as evidenced by subsequent major rule violation(s);

   n. Documented leadership in a security threat group that is certified by the threat assessment review committee in central office.

   (b) Close Management II (CMII).

   1. CMII is restrictive cell housing, which may or may not be restricted to single cell housing.

   2. An inmate may be placed into CMII without having previously been placed in CMIII. Any of the following factors constitutes a basis for placement of an inmate in CMII status:

   a. An act or acts in the community, during other periods of confinement, or any circumstances associated with the current period of incarceration such that safety, security, and public safety concerns suggest further review prior to placement in open population;

   b. A pattern of predatory actions which makes an inmate a threat to others;

   c. An act causing injury or an act which could have resulted in injury to another;

   d. An escape or an escape attempt from within the secure perimeter of a facility without violence, the use of weapons, the taking of hostages, the use of equipment or tools, or outside assistance;

   e. Participation in riots or disorders during any period of incarceration;

   f. A pattern of behavior during the present period of incarceration involving acts of violence or threats of violence;

g. Initiated or participated in a contraband trafficking operation involving negotiables, escape paraphernalia [other than items listed in sub-subparagraph (2)(a)2.h.], or other items that present a threat to the safe and secure operation of the institution or facility;

h. Presents a risk to another inmates safety and well being in population, as identified by an act or acts which demonstrates an inability to live in general population without endangering others;

i. Is currently CMIII and shows an inability to adjust as evidenced by subsequent major rule violation(s).

(c) Close Management III.

1. CMIII is the least restrictive cell housing unit in close management.

2. Any of the following factors constitutes a basis for placement of an inmate in CMIII Status:

a. An escape or an escape attempt, or a documented history of escape from a non-secure facility or environment without violence, weapons, outside assistance, or the arrest for any other felony while on escape;

b. Assisting or aiding in an escape or an escape attempt;

c. A history of disciplinary action or institutional adjustment reflecting an inability to live in the general inmate population without disrupting the operation of the institution;

d. Participation in a predatory or aggressive act through the use of force or intimidation;

e. Participation in a riot or disorder by refusing to follow orders or staff;

f. Possession of unauthorized drugs, testing positive for drugs on a urinalysis test, possession of negotiables, escape paraphernalia [except items listed in sub-subparagraph (2)(a)2.j.], or other items that present a threat to the safe and secure operation of the institution or facility; and

g. Validated membership in a security threat group that has been certified by the threat assessment review committee in central office.

(3) Procedures for Placement in Close Management.

(a) Close management is the confinement of an inmate apart from the general population, for reasons of security, or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others. The secretary shall designate which institutions are authorized to house close management inmates, based on the needs of the department.

(b) When an inmate in general population has committed acts that threaten the safety of others, threaten the security of the institution, or demonstrate an inability to live in the general population without abusing the rights and privileges of others, the inmate shall be placed in administrative confinement pending close management review. When an inmate in any other confinement status has committed acts that threaten the safety of others, threaten the security of the institution, or demonstrated an inability to live in a segregated population without abusing the rights and privileges of others the inmate shall be housed in his or her current status pending close management review. Inmates being considered for close management who have completed disciplinary confinement and the final decision regarding close management placement has not been determined will be housed in administrative confinement until the review and decision is made by the SCO.

(c) The classification officer shall complete section I of the Report of Close Management, Form DC6-233C. Form DC6-233C is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399. The effective date of the form is 4-8-04. Upon completion of section I, the classification officer shall forward Form DC6-233C to the classification supervisor. The classification officer shall ensure

that the inmate receives a copy of the Report of Close Management, Form DC6-233C, to prepare for the close management review. The inmate will be given a minimum of 48 hours to prepare for the review unless waived by completing a Close Management Waiver, Form DC6-265. Form DC6-265 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-01971. The effective date of the form is 2-1-01. The inmate may present information verbally or in writing for consideration by the ICT. The staff member delivering Form DC6-233C to the inmate shall document on Form DC6-233C that the inmate was informed of his or her allotted time to prepare for the review.

(d) Prior to docketing an inmates case for close management review, the classification supervisor will submit a referral to the senior psychologist for evaluation of the inmate utilizing the Close Management Referral Assessment, Form DC6-128. Form DC6-128 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-03418. The effective date of the form is 12/13.

(e) Mental health staff will complete the close management referral assessment within five working days of receipt and return it to the classification supervisor.

(f) Upon receiving the completed close management referral assessment, the classification supervisor will submit the case for ICT Docket.

(g) ICT Hearing. The ICT shall evaluate the recommendations for close management placement and the mental health assessment, interview the inmate, and consider the information provided by the inmate. The ICT shall ensure that the inmate was given a minimum of 48 hours to prepare for the review unless waived by completing a Close Management Waiver, Form DC6-265. The team shall document on Form DC6-233C that the inmate was allowed at least 48 hours to prepare for the review. The ICT shall inquire whether or not the inmate is in need of staff assistance. A staff assistant shall be assigned to assist an inmate when the team determines that the inmate is illiterate or does not understand English, has a disability that would hinder the inmates ability to represent him or herself, or when the complexity of the issue makes it unlikely that the inmate will be able to properly represent him or herself. This assistance can also be provided at the inmates request. In such event, it is the responsibility of the staff member to explain the close management recommendation and procedures to the inmate. Even though the staff member will be authorized to assist an inmate during the hearing and aid the inmate in presenting his or her position, the staff member shall not take the position of an advocate or defense attorney for the inmate. The ICT is authorized to postpone the case review to allow an inmate additional time to prepare. If an extension of time is given, the team shall document the postponement on Form DC6-233C. The inmate will appear at the hearing unless he or she demonstrates disruptive behavior, either before or during the hearing, that impedes the process or the inmate waives his or her right to be present at the close management hearing. If the inmate waives his or right to be present at the close management hearing, the Close Management Waiver, Form DC6-265, shall be completed. In such cases, the review will be completed without the inmate. The absence, removal, or presence of the inmate will be documented on Form DC6-233C. After the interview and review of all pertinent information including the mental health assessment, the ICT will make a recommendation to the SCO. This recommendation will be documented on Form DC6-233C. The ICT will inform the inmate of the basis for its decision and provide a copy of the teams decision to the inmate after the conclusion of the hearing. The ICT classification member will ensure that the team results are entered in OBIS.

(h) The SCO will review the recommendations of the ICT, the Close Management Referral Assessment, Form DC6-128, and other pertinent information before making the final decision regarding close management placement. This review will be on site and the SCO may interview the inmate, except in situations requiring more immediate action. In these cases, the SCO will review the documentation in OBIS. The SCO will approve, disapprove, or modify the ICTs recommendation or obtain further information from the team before reaching a final decision. If the teams recommendation is disapproved or modified by the SCO, the inmate will be informed of the decision in writing by the SCO. Inmate notification will not be required when the SCO has approved the ICTs recommendation. After the review is complete, the SCO will document its decision in OBIS. A copy of Form DC6-233C will be kept in the inmate record file.

(4) Transfers From a Non-CM Institution.

(a) Once a CM recommendation is made, the ICT will also enter a transfer recommendation in OBIS.

(b) The inmate will remain in administrative or current confinement status pending review and final decision of the SCO. If the inmates release date from disciplinary confinement expires, the inmate shall be placed in administrative confinement until the review and decision is made by the SCO.

(c) If placement in CM is approved, the SCO will document its decision in OBIS and notify Population Management for future transfer of the inmate to an appropriate CM facility.

(d) If the CM recommendation is disapproved, the SCO will determine if a transfer for other management reasons should be approved. The SCO will document its decision in OBIS. If a transfer is approved, the SCO will notify Population Management for future transfer of the inmate to an appropriate non-CM facility.

(5) Transfers While Inmate is in CM Status.

(a) If an inmate in close management is reassigned to another level of close management which requires transfer to another institution, the time spent awaiting transfer will be taken into consideration when setting the schedule of reviews by the ICT at the receiving institution.

(b) To transfer an inmate in close management status to another close management facility, the following will occur:

1. The ICT from the sending institution will recommend the appropriate level of close management based upon the criteria and facts for placement prior to the transfer.

2. Transfers will be limited to those inmates in close management:

a. Who are being recommended for a close management level that the sending institution is not capable of providing, based on institutional mission or close management stratification issues, or

b. Situations that involve special reviews. Inmates with protection or threat reviews involving inmates housed at the same CM facility will be handled within the CM unit and, unless exceptional circumstances exist, will not be transferred from one CM institution to another based solely on these reviews, or

c. Situations that require an inmate to be moved to a higher level facility.

(c) The recommendation by the ICT to transfer a close management inmate will be decided by the SCO. If approved, the SCO will submit notification to Population Management for transfer of the inmate. The receiving institution shall then place the inmate directly into the approved close management status without completing an additional evaluation.

(d) If the transfer recommendation is disapproved, the SCO will provide written notification to the ICT of the requesting institution of its decision not to transfer.

(e) After the review is complete, the SCO will document its decision in OBIS.

(6) Close Management Facilities.

(a) The number of inmates housed in a close management cell will not exceed the number of bunks in the cell.

(b) The only exception to paragraph (6)(a) is during an emergency situation as declared by the warden or duty warden. The emergency will be made known to the regional director and to the emergency action center in the central office. If the exception exists in excess of 24 hours, the warden or duty warden must get specific authorization from the regional director to continue to house inmates beyond the 24 hour period in such conditions.

(c) Prior to placing inmates in the same cell, the inmate will be interviewed by the housing supervisor and a review will be initiated to determine if any of the inmates in the close management unit are a threat to the inmate being placed, or if the inmate being placed is a threat to other inmates in the unit.

(d) If the inmate cannot be placed for these reasons, the housing supervisor will place or maintain the inmate in administrative confinement until the issue can be expeditiously resolved. The case will be immediately forwarded to the ICT for review. The ICT will review the case, interview the inmate, and forward recommendations to the SCO. The SCO will review the case and may interview the inmate and make a final decision on the inmates placement.

(e) Water Supply to CM Units. All close management cells will be equipped with toilet facilities and running water for drinking and other sanitary purposes. Water in the cell can be turned off when necessary due to misbehavior. Misbehavior is defined as any activity exhibited by an inmate which causes an interruption in the water system and its proper function, such as intentionally clogging a toilet bowl or sink with paper in order to then flood the housing area. It also includes the intentional misuse of the water for such purposes as throwing it on staff or other inmates, or mixing it with another substance for an unauthorized purpose (inmate mixes water with soap or shampoo and applies to the floor or himself or herself to hinder cell extraction). In such event, the inmate will be furnished with an adequate supply of drinking water by other means to prevent dehydration. This action can be taken in addition to formal disciplinary action being taken against the inmate pursuant to established procedures regarding disciplinary action. Any misbehavior from an inmate and subsequent action by security staff will be documented on the Daily Record of Special Housing, Form DC6-229. Form DC6-229 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, https://www.flrules.org/Gateway/reference.asp?No=Ref-00220. The effective date of the form is 4-6-11.

(f) Prior to placement of an inmate in a close management cell, the cell will be thoroughly inspected by the housing officer to ensure that it is in proper order. The housing officer shall document the cells condition on Form DC6-221, Cell Inspection. After such time, the inmate housed in that cell will be responsible for the condition of the cell. Form DC6-221 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-01968. The effective date of the form is 12-16-01.

(g) The close management cells will be physically separate from other confinement cells whenever possible given the physical design of the facility and the number of inmates housed in a close management cell shall not exceed the number of bunks in the cell. Whenever such location is not possible, physical barriers shall be placed to preclude the cross association of those in close management with those in other statuses. Close management cells shall be built to permit verbal communication and unobstructed observation by the staff.

(h) Inmates shall be weighed upon entering close management, at least once a week while in close management, and upon leaving close management. The weight of the inmate shall be documented on Form DC6-229, Daily Record of Special Housing.

(7) Individualized Service Plan (ISP).

(a) The multi-disciplinary services team will develop an ISP, Form DC4-643A, when deemed necessary by mental health staff. Form DC4-643A is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-01964. The effective date of the form is 12-12.

(b) The ISP will be developed based on the inmates needs assessment and will take into consideration the inmates behavioral risk, as determined by the MDST in accordance with subsection (8) of this rule.

(c) The ISP will incorporate mental health, programs, and other services required to address identified problems and to prevent the development or exacerbation of mental and other adjustment problems.

(d) An ISP shall be established within 14 days of CM placement of each inmate who suffers from mental impairment, or who is at significant risk for developing such impairment, as determined by mental health staff.

(e) If an ISP exists at the time of CM placement, it shall be updated within 14 days of CM placement to reflect current problems, goals, services, and providers. The ISP shall also be updated within 14 days of an inmates transfer between CM institutions.

(f) The MDST shall review, and if indicated, revise the ISP as needed, but not less frequently than the following:

1. Within three working days of the inmates involvement in a critical event.

2. Within 30 days of establishing or updating an ISP.

3. 120 days after the initial (30) day review.

4. Every 180 days after the 120 day review, until mental health staff determines that ongoing mental health care is no longer necessary, at which time the ISP will be closed.

(g) The ISP shall be signed by each member of the MDST.

(8) Behavioral Risk Assessment.

(a) The MDST shall determine behavioral risk of each CM team decision inmate by completing the Behavioral Risk Assessment (BRA), Form DC4-729. Form DC4-729 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-01965. The effective date of the form is 4-8-04.

(b) Behavioral risk shall be determined as follows:

1. Within three working days of the inmates involvement in a critical event.

2. Within 14 days of CM placement.

3. Within 120 days of the initial (14 day) assessment; and every 180 days thereafter.

(c) The BRA shall be completed at the above intervals regardless of S-grade or housing assignment, including, for example, when the CM inmate is housed outside the CM unit in order to access necessary medical or mental health care.

(d) Security shall consider results from the behavioral risk assessment and other information relevant to staff and inmate safety and institutional security in determining the level of restraints required during out-of-cell activities such as individual or group counseling.

(e) The ICT shall consider results from the behavioral risk assessment and other information relevant to institutional adjustment, staff and inmate safety, and institutional security when making recommendations for modification of the inmates CM status.

(f) The SCO shall consider results from all behavioral risk assessments and all results from mental health evaluations that have been completed since the inmates last formal assessment and evaluation, and other information relevant to institutional adjustment, staff and inmate safety, and institutional security in its review of ICT recommendations made after CM placement.

(9) Mental Health Services.

(a) Chapter 33-404, F.A.C., Mental Health Services, shall apply to CM inmates except where otherwise specified herein.

(b) CM inmates shall be allowed out of their cells to receive mental health services as specified in an ISP unless, within the past 4 hours, the inmate has displayed hostile, threatening, or other behavior that could present a danger to others. Security staff shall determine the level of restraint required while CM inmates access services outside their cells.

(10) Conditions and Privileges in CM Units.

(a) Clothing - Inmates in close management shall be provided the same clothing and clothing exchange as the general inmate population unless there are facts to suggest that on an individual basis exceptions are necessary for the welfare of the inmate or the security of the institution. In such cases, the exceptions shall be documented on Form DC6-229 and approved by the chief of security. Shower slides may be substituted for regulation shoes. Any item may be removed from the cell in order to prevent the inmate from inflicting injury to him or herself or others or to prevent the destruction of property or equipment. If an inmates clothing is removed, a modesty garment shall be immediately obtained and given to the inmate. If the inmate chooses not to wear the garment, the garment shall be left in the cell and this action shall be documented on Form DC6-229, Daily Record of Special Housing. Under no circumstances shall an inmate be left without a means to cover him or herself.

(b) Bedding and linen - Bedding and linen for inmates in close management shall be issued and exchanged the same as is provided to the general inmate population. Any exceptions shall be based on potential harm to individuals or a threat to the security of the institution. The shift supervisor or the senior correctional officer must approve the action initially. Such exceptions shall be documented on Form DC6-229 and the chief of security shall make the final decision in regard to action no later than the next working day following the action.

(c) Personal Property - Inmates shall be allowed to retain personal property including stamps, watches, rings, writing paper, envelopes and health and comfort items unless there is an indication of a security problem. Close management inmates at all levels shall be allowed to possess a walkman type radio with approved headphones as is allowed for general population inmates. Exceptions or removal of any item will be documented on the Form DC6-229. An Inmate Impounded Personal Property List, Form DC6-220, will be completed by security staff and signed by the inmate designating what personal items were removed. The original will then be placed in the inmates property file and a copy of the form will be given to the inmate for his or her records. If items of clothing, bedding or personal property are removed in order to prevent the inmate from inflicting injury to him or herself or others, to prevent the destruction of property or equipment, or to prevent the inmate from impeding security staff from accomplishing functions essential to the unit and institutional security, staff shall re-assess the need for continued restriction every 72 hours thereafter. The warden, based on this assessment, will make the final determination on the continued denial or return of the items. The items will be returned to the inmate when no further behavior or threat of behavior of the type leading to the restriction has occurred. Form DC6-220 is incorporated by reference in Rule 33-602.220, F.A.C.

(d) Comfort Items - Inmates in close management shall be permitted personal hygiene items and other medically needed or prescribed items such as eye glasses or hearing aids, except when security requirements dictate otherwise. Inmates in close management shall not possess any products that contain baby oil, mineral oil, cocoa butter, or alcohol. In the event certain items that inmates in close management are not normally prohibited from possessing are removed, the senior correctional officer shall be notified and must approve the action taken, or the item must be returned to the inmate. Action taken shall be recorded on the Daily Record of Special Housing, Form DC6-229, which must be reviewed by the chief of security. When any personal property is removed, an Inmate Impounded Personal Property List, Form DC6-220, designating what personal items were removed, shall be completed by security staff and signed by the inmate. The following comfort items shall be provided as a minimum: toothbrush, toothpaste, bar of soap, towel or paper towels, and feminine hygiene products for women, and toilet tissue.

(e) Personal Hygiene - Inmates in close management shall meet the same standards in regard to personal hygiene as required of the general inmate population.

1. At a minimum each inmate in close management shall shower three times per week and on days that the inmate works.

2. Male inmates shall be required to shave at least three times per week. The possession and use of shaving powder in close management is prohibited. An inmate housed in close management who is medically exempt from using shaving razors will be clipper-shaved at least three times per week.

3. Hair care shall be the same as that provided to and required of the general population inmates.

(f) Diet and Meals - All inmates in close management shall receive normal institutional meals as are available to the general inmate population except that if any item on the regular menu might create a security problem in the close management area, then another item of comparable quality shall be substituted. An alternative meal (special


management meal) may be provided for any inmate in close management who uses food or food service equipment in a manner that is hazardous to him or herself, staff, or other inmates. The issuance of a special management meal will be in strict accordance with Rule 33-602.223, F.A.C. Any deviation from established meal service is to be documented by security staff on the Daily Record of Special Housing, Form DC6-229.

(g) Canteen Items.

1. Inmates in CMI and II, following 30 days in close management status and having no major rule violations during this period, will be allowed to make canteen purchases through canteen order once per week unless restricted by disciplinary action. Inmates in CMI and II will be allowed to purchase up to five non-food items and five food items. In making this determination, with the exception of stamps and notebook paper, it is the number of items that is counted not the type of item. For example, three security pens counts as three items, not one item. Twenty-five stamps or fewer will count as one item and two packages or less of notebook paper will count as one item.

2. Inmates in CMIII, following 30 days in close management status and having no major rule violations during this period, will be allowed to make canteen purchases through canteen order once each week unless restricted by disciplinary action. Inmates in CMIII will be allowed to purchase up to five non-food items and ten food items. In making the determination, with the exception of stamps and notebook paper, it is the number of items that is counted not the type of item. For example, three packages of cookies count as three items, not one item.

3. Any disciplinary reports received by an inmate in which there is a guilty finding and placement in disciplinary confinement or suspension of canteen privileges between the time that he or she requests canteen food items and the delivery of those items will result in disapproval of the requested items.

4. CM inmates who submit an order for canteen items and then refuse delivery shall be subject to disciplinary action and loss of canteen privileges.

(h) Religious Accommodations - Inmates in close management status shall be allowed to participate in religious ceremonies that can be accomplished at cell-side (for example, communion). Additionally, close management inmates shall be allowed to possess religious publications as defined in Rule 33-503.001, F.A.C., and have access to a spiritual advisor or clergy visit with citizen clergy persons at a time and location approved by the warden. Religious publications shall not count toward the limit on personal book possession set forth in paragraph (10)(l) but do fall under the storage space provisions of Rule 33-602.201, F.A.C.

(i) Legal Access - An inmate in close management will have access to his or her personal legal papers and law books and have correspondence access with the law library. Access to the law library will be obtained through delivery of research materials to an inmates cell, and access to visits with certified inmate law clerks. Although the inmate may not be represented by an attorney at any administrative hearing under this rule, access to an attorney or aide to that attorney will be granted for legal visits at any reasonable time during normal business hours. Indigent inmates will be provided paper and writing utensils in order to prepare legal papers. Inmates who are not indigent will be allowed to purchase paper and envelopes from the canteen for this purpose, within the stated time frames. Inmates with disabilities that hinder the preparation of legal correspondence will be allowed the use of auxiliary aids (writer/reader). An inmate who is provided an auxiliary aid shall also be allowed access to certified inmate law clerk for the purpose of preparing legal documents, legal mail, and filing grievances.

(j) Correspondence - Inmates in close management shall have the same opportunities for correspondence that are available to the general inmate population.

(k) Writing utensils - Inmates in close management shall possess only security pens. Other types of pens or pencils shall be confiscated and stored until the inmate is released from close management status. If a security pen is not available, the inmate shall be allowed to sign out a regular pen from the confinement unit officer. All care shall be taken to ensure that an inmate who requests access to a pen in order to prepare legal documents or legal mail or to file a grievance with the department has access to a pen for a time period sufficient to prepare the legal mail, documents, or grievances. Inmates shall be allowed to purchase security pens within the specified time frames. An inmate who has been provided a writer/reader will be allowed access to such for the purpose of reading and preparing correspondence.

(l) Reading materials - Reading materials are allowed in close management units unless there is an indication of a threat to the safety, security, or sanitation of the institution. An inmate shall be limited to possession of three personal soft cover books. If it is determined that there is a safety, security or sanitation risk, the items will be removed. Such removal of reading materials will be documented on Form DC6-229, Daily Record of Special Housing. If items are removed in order to prevent the inmate from inflicting injury to him or herself or others or to prevent the destruction of property or equipment, staff shall re-assess the need for continued restriction every 72 hours thereafter. The warden, based on this assessment, will make the final determination on the continued denial or return of the items. The items will be returned to the inmate when no further behavior or threat of behavior of the type leading to the restriction has occurred. An inmate who receives services from the Bureau of Braille and Talking Book library will be allowed to have his tape player, devotional or scriptural material tapes, and other books on tape which are in compliance with Rule 33-501.401, F.A.C.

(m) Exercise - Those inmates confined on a 24-hour basis excluding showers and clinic trips may exercise in their cells. If the inmate requests a physical fitness program handout, the wellness specialist or the close management officer shall provide the inmate with an in-cell exercise guide and document such on the Daily Record of Special Housing, Form DC6-229. However, an exercise schedule shall be implemented to ensure a minimum of six hours per week (two hours three days per week) of exercise out of doors. The assignment and participation of an inmate on the restricted labor squad or other outside work squad required to work outside at least one day per week will satisfy the minimum exercise requirements for the week. Such exercise periods shall be documented on Form DC6-229. The ICT is authorized to restrict exercise for an individual inmate only when the inmate is found guilty of a major rule violation as defined in this rule, or if the inmate has pending a disciplinary hearing for a major rule violation as defined in this rule. Inmates shall be notified in writing of this decision and may appeal through the grievance procedure. The denial of exercise shall be for no more than 15 days per incident and for no longer than 30 days in cumulative length. Medical restrictions determined by health services staff can also place limitations on the amount and type of exercise permitted. Such restrictions of exercise periods will be documented on the Daily Record of Special Housing, Form DC6-229. A disabled inmate who is unable to participate in the normal exercise program will have an exercise program developed for him that will accomplish the need for exercise and take into account the particular inmates limitations. Close management inmates shall be allowed equal access to outdoor exercise areas with exercise stations.

(n) At a minimum, wellness services for close management inmates at all levels shall be provided through cell-front tutoring, wellness puzzles, and the wellness education course.

(11) Programs and Privileges in Close Management Units.

(a) While in a close management unit, an inmates movement within the institution and contacts with other individuals will be restricted. Privileges will also be limited depending on the specific close management level. If an inmate transfers to a less restrictive level due to satisfactory adjustment, the adjustment period required for any privilege shall be waived. Upon placement in CM, inmates shall receive a copy of the Close Management Housing Unit Instructions, Form NI1-046. Form NI1-046 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No =Ref-01973. The effective date of the form is 3-10-05.

(b) CMI. Privileges for an inmate assigned to CMI are as follows:

1. Participation in available approved programs, including in-cell educational opportunities, that the inmate can perform within the cell unless precluded by safety or security concerns;

2. Check out three soft-back books from the library at least once per week and possess no more than three soft back library books at any given time. An inmate who receives services from the Bureau of Braille and Talking Book Library will be allowed to check out three books in braille or on tape per week and possess no more than three books at any given time, even though the actual number of tapes may be more than three per book. Books checked our from the library shall not count toward the limit on personal book possession set forth in paragraph (10)(l);

3. Conduct routine inmate bank transactions;

4. Inmates may subscribe to, purchase, or receive no more than one periodical which is printed and distributed more frequently than weekly and four other periodicals which are printed and distributed weekly or less frequently than weekly;

Case 1:16-cv-00372-JCN Document 25-1 Filed 03/20/17 Page 12 of 19 PageID #: 175

12

an inmate who receives services from the Bureau of Braille and Talking Book Library will be allowed to receive up to four issues of a periodical;

5. Make one telephone call of the length allowed by Rule 33-602.205, F.A.C., every 30 days after 30 days in close management status and having no major rule violations during this period as well as emergency telephone calls and telephone calls to an attorney as explained in Rule 33-602.205, F.A.C.;

6. Unless restricted pursuant to Rule 33-601.731, F.A.C., CMI inmates shall be eligible to receive one two-hour non-contact personal visit by appointment:

a. After completing 30 days in close management status and having no major rule violations during this period.

b. If found guilty of any major rule violations while assigned to CMI, the inmate is eligible to be considered for visits 30 days following release from disciplinary confinement or the disciplinary hearing, if a penalty other than disciplinary confinement was imposed.

c. The inmate is eligible to receive one two-hour non-contact personal visit by appointment after each subsequent 30 day period with no major rule violations while in the status unless security or safety concerns would preclude a visit.

d. All visits for CMI inmates will be non-contact visits.

(c) CMII. In addition to the programs provided for CMI inmates and those privileges outlined in subparagraphs (11)(b)1.-4. of this rule, the following privileges are authorized:

1. Unless restricted pursuant to Rule 33-601.731, F.A.C., CMII inmates will be eligible to receive one two-hour non-contact personal visit by appointment:

a. After completing 30 days in close management status and having no major rule violations during this period.

b. If found guilty of any major rule violations while assigned to CMII, the inmate is eligible to be considered for a visit 30 days following release from disciplinary status or the disciplinary hearing if a penalty other than disciplinary confinement was imposed.

c. The inmate is eligible to receive personal visits by appointment after each subsequent 14 day period with no major rule violations while in the status unless security and safety concerns would preclude a visit.

d. All visits for inmates in CMII will be non-contact visits.

2. CMII inmates shall be allowed to make one telephone call of the length allowed by Rule 33-602.205, F.A.C., every 14 days after 30 days in close management status and having no major rule violations during this period as well as emergency telephone calls and calls to attorneys as provided in Rule 33-602.205, F.A.C.

3. CMII inmates, following 30 days in close management status and having no major rule violations during this period, shall be allowed access to the day room area for social purposes to include watching television programs for up to two days per week, not to exceed 4 hours per occasion or to extend beyond 10:00 p.m. This is allowed only when it does not conflict with organized program activities. The number of participants at any one time will be determined by the senior correctional officer in consultation with the duty warden. This determination will be based on considerations such as day room size, availability of seating, and safety and security issues associated with the availability of supervising staff as well as staff available for response should a problem develop. CMII inmates will be restrained during the above-described dayroom access unless determined by the senior correctional officer that the inmate can safely participate without restraints.

4. Participation in educational and program opportunities shall be in-cell or out of cell as determined by security and programs staff.

(d) CMIII. In addition to the programs provided above for CMI inmates, and those privileges outlined in subparagraphs (11)(b)1.-4. of this rule, the following privileges are authorized:

1. CMIII inmates will be entitled to:

a. Unless restricted pursuant to Rule 33-601.731, F.A.C., CMIII inmates shall be eligible to receive one two-hour contact personal visit by appointment after completing 30 days in close management status and having no major rule violations during this period.

b. CMIII inmates shall be subject to placement on non-contact status as outlined in Rule 33-601.735, F.A.C.

c. If found guilty of a major rule violation while assigned to CMIII, the inmate is eligible to be considered for visits 14 days following release from disciplinary status or the disciplinary hearing if a penalty other than disciplinary confinement was imposed.

d. The inmate is eligible to receive one two-hour contact personal visit by appointment after each subsequent 14 day period with no major rule violations during this period unless security or safety concern would preclude a visit. The warden will determine the level of supervision and restraint required.

2. CMIII inmates, following 30 days in close management status and having no major rule violations during this period shall be allowed access to the day room area for social purposes to include watching television programs for up to five days per week, not to exceed 4 hours per occasion or to extend beyond 10:00 p.m. This is allowed only when it does not conflict with organized program activities. The number of participants at any one time will be determined by the senior correctional officer in consultation with the duty warden. This determination will be based on considerations such as day room size, availability of seating, and safety and security issues associated with the availability of supervising staff as well as staff available for response should a problem develop. CMIII inmates shall not be restrained for dayroom activities unless security or safety concerns require otherwise.

3. CMIII inmates shall be allowed to make one telephone call of the length allowed by Rule 33-602.205, F.A.C., every seven days after 30 days in close management status and having no major rule violations during this period as well as emergency telephone calls and calls to attorneys as provided in Rule 33-602.205, F.A.C.

4. CMIII inmates shall be provided with at least the same opportunities for educational and program participation as provided to CMII inmates.

(12) Suspension of Privileges. The ICT shall suspend an inmates privileges if security and safety concerns would preclude an inmate from receiving certain privileges. Any action taken by the ICT regarding the suspension or limiting of privileges will be documented on the Daily Record of Special Housing, Form DC6-229. Privileges suspended by the ICT in excess of 30 days will require the review and approval of the SCO.

(13) Work Assignments.

(a) The decision to make work assignments and the type of assignments made will be determined by the ICT. Inmates shall be provided the opportunity for work assignment consideration as determined by the ICT except when precluded by doctors orders for medical reasons.

(b) CMI inmates are restricted from all outside cell work activities. CMII inmates are only eligible for work assignments on restricted labor squads or in CMI, II, or death row housing units. CMIII inmates are eligible for work assignments either inside or outside the close management unit, including restricted labor squads, work assignments within other close management units, and work assignments usually designated for open population inmates.

(c) Outside work assignments shall be performed during day light hours.

(14) Restraint and Escort Requirements.

(a) CMI.

1. Prior to opening a cell for any purpose, including exercise, health care or disciplinary call-outs, telephone calls, recreation, and visiting, the inmate shall be handcuffed behind his or her back. If documented medical conditions require that the inmate be handcuffed in front, waist chains will be used in addition to the handcuffs and the escort officers shall be particularly vigilant.

2. A minimum of two officers shall be physically present at the cell whenever the cell door is opened.

3. Prior to escorting an inmate from a cell the inmate shall be thoroughly searched. If the inmate is being taken outside the immediate housing unit or designated adjacent exercise area, leg irons and other restraint devices shall be applied.

(b) CMII. The same restraints and escort requirements as provided for CMI inmates above apply to CMII inmates with the exception that the senior correctional officer shall be authorized to approve unrestrained participation in group and individual counseling, dayroom access, and inside work assignments.

(c) CMIII. Unless precluded by specific safety and security concerns, CMIII inmates shall be escorted within the unit and to exercise areas attached to the unit as well as to all program and privilege activity participation without restraints. The warden shall base any determination to require restraints on the security and safety needs of his or her individual institution and CM unit.

(d) Due to the unique mission of close management units, it is understood that more than one inmate may be out of his or her cell within the unit at any one time. However, whenever inmates are being escorted in restraints, there shall be one officer with each inmate and the inmates shall be kept at a distance from each other which would preclude any unauthorized physical contact. Extreme care shall be exercised when escorting restrained inmates in areas where unrestrained inmates are present. When possible, unrestrained inmates will be returned to their cells, removed from the wing or, at a minimum, closely supervised by additional staff until the escort of restrained inmates is completed.

(15) Contact by Staff. The following staff members shall be required to officially inspect and tour the close management unit. All visits by staff shall be documented on the Inspection of Special Housing Record, Form DC6-228. Form DC6-228 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-01969. The effective date of the form is 2-12-01. The staff member shall also document his or her visit on the Daily Record of Special Housing, Form DC6-229, if there is any discussion of significance, action or behavior of the inmate, or any other important evidential information which may have an influence or effect on the status of confinement. These visits shall be conducted at a minimum of:

(a) At least every 30 minutes by a correctional officer, but on an irregular schedule.

(b) Daily by the housing supervisor.

(c) Daily by the officer-in-charge on duty for all shifts except in case of riot or other institutional emergency.

(d) Daily by medical staff.

(e) Weekly by the chief of security (when on duty at the facility) except in case of riot or other institutional emergency.

(f) Weekly by the chaplain. More frequent visits shall be made upon request of the inmate if the chaplains schedule permits.

(g) Weekly by mental health staff.

(h) Weekly by the warden and assistant wardens.

(i) At least once a week by a classification officer.

(16) Review of Close Management.

(a) An ICT member shall review inmates in close management at least once every week for the first 60 days and once every 30 days thereafter. For the purposes of this review the ICT member shall be the warden, assistant warden for operations or programs, a chief of security, or classification supervisor. The purpose of this review shall be toward reducing the inmates status to the lowest management level or returning the inmate to general population as soon as the facts of the case indicate that this can be done safely, and, if applicable, review the inmates disciplinary confinement status as outlined in subsection 33-602.222(8), F.A.C. If, upon completion of the ICT members weekly or 30 day review, an ICT review for modification of the close management team decision, release to general population, or release from disciplinary confinement status is indicated, the ICT member shall notify the classification supervisor. The classification supervisor shall ensure that the case is placed on the docket for ICT review. During the review, the ICT shall consider the results of the behavioral risk assessments and mental health evaluations that have been completed prior to the review, and other information relevant to institutional adjustment, staff and inmate safety, and institutional security.

(b) All services provided by any mental health or program staff member shall be recorded on the Daily Record of Special Housing, Form DC6-229, which shall be kept in the CM unit.

(c) When an inmate has not been released to general population and is in any close management status for six months, the classification officer shall interview the inmate and shall prepare a formal assessment and evaluation on the Report of Close Management. Such reports shall include a brief paragraph detailing the basis for the CM team decision, what has transpired during the six-month period, and whether the inmate should be released, maintained at the current level, or modified to another level of management. The case shall be forwarded to the classification supervisor who shall docket the case for ICT review.

(d) The ICT shall review the report of close management prepared by the classification officer, consider the results of behavioral risk assessments and mental health evaluations and other information relevant to institutional adjustment, staff and inmate safety, and institutional security, and insert any other information regarding the inmates status. If applicable, the ICT shall review the inmates disciplinary confinement status in accordance with subsection 33-602.222(8), F.A.C. The inmate shall be present for an interview unless he or she demonstrates disruptive behavior, either before or during the hearing, that impedes the process, or the inmate waives his or her right to be present at the close management hearing, the Close Management Waiver, Form DC6-265, shall be completed. In such cases, the review will be completed without the inmate. The absence, removal or presence of the inmate will be documented on Form DC6-233C. The ICTs CM and, if applicable. Disciplinary confinement status recommendations shall be documented in OBIS and the Report of Close Management, Form DC6-233C. If it is determined that no justifiable safety and security issues exists for the inmate to remain in close management the ICT shall forward their recommendation for release to the SCO for review. For an inmate to remain in close management the ICT shall justify the safety and security issues or circumstances that can only be met by maintaining the inmate at the current level or modifying the inmate to another level of management.

(e) The SCO shall conduct an onsite interview with each inmate at least once every six months or as often as necessary to determine if continuation, modification, or removal from close management status is appropriate. The SCO shall review all reports prepared by the ICT concerning an inmates close management and, if applicable, disciplinary confinement status, consider the results of behavioral risk assessments and mental health evaluations and other information relevant to institutional adjustment, staff and inmate safety, and institutional security. The SCO shall interview the inmate unless exceptional circumstances exist or the inmate is approved for release to general population. If it is determined that no justifiable safety and security issues exist for the inmate to remain in close management the SCO shall cause the inmate to be immediately released. For an inmate to remain in close management, the SCO shall determine based on the reports and documentation that there are safety and security issues or circumstances for maintaining the inmate at the current level or at a modified level of management. If applicable and in accordance with subsection 33-602.222(8), F.A.C., the SCO shall determine whether the inmate is to continue or be removed from disciplinary confinement status. The SCOs decisions shall be documented in OBIS and the Report of Close Management, Form DC6-233C. The SCO shall advise the inmate of its decision.

(f) Reviews required by this section shall be completed regardless of the inmates housing assignment, including when a CM inmate is housed outside the CM unit in order to access medical or mental health care.

(g) Before an inmate is released from CM, written authorization must be obtained by the SCO from the regional director if any of the following apply;

1. The inmate has been convicted, regardless of whether adjudication is withheld, of any assault or battery, or any attempted assault or battery that occurred during the inmates current period of incarceration, that constitutes a felony on a staff member;

2. The inmate has an active detainer as a result of any assault or battery, or any attempted assault or battery, that occurred during the inmates current period of incarceration, that constitutes a felony on a staff member; or

3. The inmate is confined in Florida under the Interstate Corrections Compact and has been convicted, regardless of whether adjudication is withheld, of any assault or battery, or any attempted assault or battery, that occurred during the inmates current period of incarceration, that constitutes a felony on a staff member in the state from which he transferred.

(17) Close Management Records.

(a) A Report of Close Management, Form DC6-233C, shall be kept for each inmate placed in close management.

(b) A Daily Record of Special Housing, Form DC6-229, shall be maintained for each inmate as long as he is in close management. Form DC6-229 shall be utilized to document any activities, including cell searches, items removed, showers, outdoor exercise, haircuts and shaves. If items that inmates in close management are not prohibited from possessing are denied or removed from the inmate, the shift supervisor or the senior correctional officer must approve the action initially. The Central Office ADA coordinator shall be contacted within 24 hours if any item is removed that would be considered an auxiliary aid or device that ensures a disabled inmate an equal opportunity as a non-disabled inmate. The items denied or removed shall be documented on Form DC6-229 and the chief of security shall make the final decision in regard to the action no later than the next working day following the action. Staff shall re-assess the need for continued restriction every 72 hours thereafter as outlined in subsection (10) of this rule. The close management unit officer shall make a notation of any unusual occurrences or changes in the inmates behavior and any action taken. Changes in housing location or any other special action shall also be noted. Form DC6-229 shall be maintained in the housing area for 30 days. After each 30 day review of the inmate by a member of the ICT, Form DC6-229 shall be forwarded to classification to be filed in the institutional inmate record.

(c) A Daily Record of Special Housing - Supplemental, Form DC6-229B, shall be completed and attached to the current Form DC6-229 whenever additional written documentation is required concerning an event or incident related to the specific inmate. Form DC6-229B is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-01970. The effective date of the form is 4-27-08.

(d) An Inspection of Special Housing Record, Form DC6-228, shall be maintained in each close management unit. Each staff person shall sign the record when entering and leaving the close management unit. Prior to leaving the close management unit, each staff member shall indicate any specific problems. No other unit activities will be recorded on Form DC6-228. Upon completion, Form DC6-228 shall be maintained in the housing area and forwarded to the chief of security on a weekly basis where it shall be maintained on file pursuant to the current retention schedule.

(e) A Housing Unit Log, Form DC6-209, shall be maintained in each close management unit. Form DC6-209 is hereby incorporated by reference. Copies of this form are available from the Forms Control Administrator, 501 S. Calhoun St., Tallahassee, FL 32399, http://www.flrules.org/Gateway/reference.asp?No=Ref-03419. The effective date of the form is 12/13. Officers shall record all daily unit activities on Form DC6-209, to include any special problems or discrepancies noted. The completed Form DC6-209 shall be forwarded daily to the chief of security for review.

(18) Staffing Issues.

(a) Officers assigned to a close management unit shall be reviewed every 18 months by the chief of security to determine whether a rotation is necessary. The chief of security shall review personnel records, to include performance appraisals, incident reports, uses of force, and any other documentation relevant to the officers assignment and job performance; interview the officer and the officers supervisors for the period of review; and shall make a recommendation to the warden as to the necessity of a rotation. The warden shall review the recommendation, request additional information, if necessary, and make the final determination as to whether the officer continues in the current assignment

or is rotated to another assignment. Any officer assigned to a close management post shall be authorized a minimum period of five days annual leave or a five day assignment to a less stressful post every six months.

(b) The Inspector General shall notify the warden and regional director of any officer involved in eight or more use of force incidents in an 18 month period. The regional director shall review the circumstances for possible reassignment.

**AUTHORITY**

Rulemaking Authority 944.09 FS.

Law Implemented 944.09 FS.

**HISTORY**

HISTORY

New 2-1-01, Amended 12-16-01, 4-8-04, 3-10-05, 4-9-06, 8-23-07, 4-27-08, 6-28-10, 4-6-11, 7-31-11, 1-4-12, 12-9-12, 12-24-13, 3-6-14.

**CASE NOTES**

ANNOTATIONS

Close management procedure

The Florida Department of Corrections rules provide specific criteria for the progression of inmates through close management (CM). Specifically, the institutional classification team is required to review the Report of Close Management prepared by the classification officer and consider the results of behavioral risk assessments and mental health evaluations and any other information relevant to institutional adjustment, staff and inmate safety, and institutional security. Further, the State Classification Office is required to review all reports prepared by the team concerning the inmates CM status as well as consider the results of behavioral risk assessments and mental health evaluations and any other information relevant to institutional adjustment, staff and inmate safety, and institutional security. For an inmate to remain in CM, the final reviewer (the State Classification Office) must determine, based upon the reports and documentation, that there are safety and security issues or circumstances for keeping the inmate within CM. See paragraph 33-601.800(16)(e), F.A.C. Hale v. McNeil, 2008 U.S. Dist. LEXIS 68995 (M.D. Fla. Sept. 10, 2008).

Due process

Plaintiff inmates right to procedural due process was not violated when the regional director denied his release from Close Management (CM) without giving any reason because paragraphs 33-601.800(16)(a) - (e), F.A.C. did not create a constitutionally protected liberty interest and he was entitled to a written reason for his continued detention on CM status. These regulations provided for preliminary steps to be taken by the ICT and SCO that did not involve he Regional Director, and imposed no requirements upon him, and did not override the provisions of paragraph 33-601.800(16)(g), F.S. McCiskill v. Whitehurst, 2011 U.S. Dist. LEXIS 110712, August 30, 2011, Decided, August 30, 2011, Filed.

Forms

Form DC6-229A, Close Management Daily Record of Segregation, is a form that is used to record, on a daily basis, information relevant to an inmates behavior. The Florida Department of Corrections rules allow for this form to be utilized while an inmate is in close management. This form is used to assist staff in assessing an inmates progress in close management. Form DC6-229A is the Close Management Daily Record of Segregation, which is maintained for each inmate as long as he is in close management. See paragraph 33-601.800(17)(b), F.A.C. The form is used to document any activities, including cell searches, items removed, showers, outdoor exercise, haircuts and shaves. The close

management unit officer shall make a notation of any unusual occurrences or changes in the inmates behavior and any action taken. Hale v. McNeil, 2008 U.S. Dist. LEXIS 68995 (M.D. Fla. Sept. 10, 2008).

The Florida Department of Corrections DC6-229A form is the Close Management Daily Record of Segregation form, on which information relevant to the inmates behavior is recorded on a daily basis. The close management unit officer shall make a notation of any unusual occurrences or changes in the inmates behavior and any action taken. The form is used to assist the staff in assessing the inmates progress in CM. Thus, since the classification officer, the classification supervisor, the institutional classification team and the State Classification Officer are concerned with whether the inmate still demonstrates an inability to live in the general population and thus are specifically focused upon other information relevant to institutional adjustment, staff and inmate safety and institutional security, this form plays a relevant role in documenting an inmates daily activities and behavior. See paragraphs 33-601.800(16)(c) - (e) and (17)(b), F.A.C. Hale v. McNeil, 2008 U.S. Dist. LEXIS 68995 (M.D. Fla. Sept. 10, 2008).

Management levels

Subparagraph 33-601.800(2)(a)2.k., F.A.C., states that possession of weapons constitutes a basis for placement of an inmate in close management level one status. Hale v. McNeil, 2008 U.S. Dist. LEXIS 68995 (M.D. Fla. Sept. 10, 2008).

Close management (CM) level I status is the most restrictive single cell housing level of all the CM management status designations, and an inmate assigned to CM level I status will be ineligible for a work assignment. See subparagraphs 33-601.800(2)(a)1. and 2., F.A.C. CM level II status is restrictive cell housing which may or may not be restricted to single cell housing, see paragraph 33-601.800(2)(b), F.A.C., and, CM level III status is the least restrictive cell housing unit in CM. See paragraph 33-601.800(2)(c), F.A.C. Hale v. McNeil, 2008 U.S. Dist. LEXIS 68995 (M.D. Fla. Sept. 10, 2008).

Close management is the confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others. See paragraph 33-601.800(1)(d), F.A.C. Hale v. McNeil, 2008 U.S. Dist. LEXIS 68995 (M.D. Fla. Sept. 10, 2008).

Assignment of an inmate to close management status is based on the prison officials professional judgment about the security risks that a particular inmate poses to the internal prison environment. When an inmate in general population has committed acts that threaten the safety of others, threaten the security of the institution, or demonstrate an inability to live in the general population without abusing the rights and privileges of others, the inmate shall be placed in administrative confinement pending close management review. See paragraph 33-601.800(3)(b), F.A.C. Hale v. McNeil, 2008 U.S. Dist. LEXIS 68995 (M.D. Fla. Sept. 10, 2008).

Pattern of behavior

Subparagraph 33-601.800(2)(b)(2)f., F.A.C., provides that a pattern of behavior during the present period of incarceration involving acts of violence or threats of violence constitutes a basis for placement of an inmate in close management level two status. Hale v. McNeil, 2008 U.S. Dist. LEXIS 68995 (M.D. Fla. Sept. 10, 2008).

Review

The Florida State Classification Office is a staff member at the central office level who is responsible for the review of inmate classification decisions and whose duties include approving, rejecting or modifying the institutional classification teams recommendations. See paragraph 33-601.800(1)(q)., F.A.C. Hale v. McNeil, 2008 U.S. Dist. LEXIS 68995 (M.D. Fla. Sept. 10, 2008).

The rules for review of close management (CM) status provide that the purpose shall be toward reducing the inmates status to the lowest management level or returning the inmate to general population as soon as the facts of the case indicate that this can be done safely. See paragraph 33-601.800(16)(a), F.A.C. Further, the rules set forth the designated responsibilities of the inmates classification officer, the classification supervisor, the institutional classification team and the State Classification Office for their review of the inmates CM status. Hale v. McNeil, 2008 U.S. Dist. LEXIS 68995 (M.D. Fla. Sept. 10, 2008).

Paragraph 33-601.800(16)(d), F.A.C., states that the institutional classification team shall review the Report of Close Management (Form DC6-233C) prepared by the classification officer, shall consider the results of the behavioral risk assessments and mental health evaluations and other information relevant to institutional adjustment, staff and inmate safety, and institutional security and insert any other information regarding the inmates status. Hale v. McNeil, 2008 U.S. Dist. LEXIS 68995 (M.D. Fla. Sept. 10, 2008).

Status decisions

A three-member institutional classification team, consisting of the warden or the assistant warden, classification supervisor and the chief of security, is responsible for making work, program, housing and inmate status decisions at the facility and for making other recommendations to the State Classification Office. See paragraph 33-601.800(1)(k), F.A.C. Hale v. McNeil, 2008 U.S. Dist. LEXIS 68995 (M.D. Fla. Sept. 10, 2008).