UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JOHN JAY CONDON, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Civil No. 1:16-cv-00372-JAW |
| | ) |
| RODNEY BOUFFARD, et al., | ) |
| | ) |
| Defendants | ) |

**MOTION FOR SUMMARY JUDGMENT**

Pursuant to F. R. Civ. P. 56(a), defendants move for summary judgment as to all claims in this matter. As grounds for this motion, defendants state that there is no issue of material fact and that, on the facts established in the record, defendants are entitled to judgment as a matter of law. Specifically, defendants state:

1. Plaintiff's placement on administrative segregation status in the Special Management Unit for approximately seven months did not violate his right to due process under the Fourteenth Amendment.

2. The Department's transfer of plaintiff to the Florida Department of Corrections did not violate his right to due process.

3. Plaintiff's due process claim regarding deprivation of property is moot.

4. Defendants' decision to transfer plaintiff out of state was not in retaliation for his filing a petition for judicial review regarding his placement in administrative segregation.

1

**Factual and Procedural Background**

Plaintiff John Condon was convicted of three murders, arson and theft in Maine in 1982 and sentenced to life in prison. He was initially incarcerated at the Mine State Prison. Due to his disruptive behavior at the prison, Condon was transferred out-of-state into the federal prison system the same year. He was incarcerated in a number of federal prisons during the ensuing decades.

Joseph Ponte was appointed Commissioner of the Maine Department of Corrections in February, 2011. Commissioner Ponte instituted a policy whereby the Department would attempt to return to Maine prisoners it had previously transferred out of state. Pursuant to this policy, Condon was given the opportunity to request a transfer back to Maine. His request was approved, and on April 20, 2012, he was returned from a federal corrections facility in Pine Top, Kentucky to the Maine State Prison.

On his return, Condon met with defendant Rodney Bouffard, who was then the warden of the prison. Bouffard informed him that the prison would monitor Condon's behavior and that, if the transfer did not work out, other placement would be sought.

On March 5, 2014, the co-manager of the prison's Close Unit, Antonio Mendez, received a confidential tip from another prisoner that Condon had threatened to kill Unit Manager Holly Harris, the co-manager of the Close Unit. Because of Condon's history of homicide and violent behavior (including his admission that he had killed a fellow prisoner in 1993 while in the federal system), Condon was immediately placed on Emergency Observation Status (EOS) in the prison's Special Management Unit (SMU). The reason for EOS placement, as stated on the EOS placement form was the possibility of a danger to the safety of others if in a less restrictive

status.  The factual basis for the placement, as set forth in the form, was "Prisoner placed on EOS pending IPS[1] investigation due to reports from staff."

Condon's status was changed from EOS to Administrative Segregation on March 8, 2014. Pursuant to the Department's Administrative Segregation policy, prisoners in segregation are provided living conditions approximately equal to those in general population.  Cells in the SMU and in the Close and Medium custody general population units are approximately the same size.  Cells in all three custody levels contain exterior windows and are equipped with tray slots in the doors, although the tray slots in SMU have an additional plastic covering for security.  Prisoners in all custody levels may turn off their cell lights, but a low light level is always on to allow security staff to observe prisoners during counts.  Cells in all custody levels are similarly furnished.  Prisoners in SMU are allowed to speak with each other and with staff, although the opportunity for physical interaction between prisoners in SMU is more restricted than in general population units.

The Department's policy requires that prisoners in Administrative Segregation be allowed out of their cells a minimum of one hour per day, five days per week, for exercise, including outdoor exercise in fenced areas.   Around the time John Condon was housed in SMU, an increasing number of programs were introduced there and prisoners were allowed out of their cells to participate in many of these programs.  Depending on the number of programs that he participated in, a prisoner on Administrative Segregation status could be out of his cell an additional six and a half hours per week.

At that time, prisoners in Administrative Segregation were allowed one telephone call and one non-contact visit per week.  They were allowed to send and receive mail.  They were

---

[1] IPS stands for Inner Perimeter Security.  The IPS team investigated criminal activity within the prison.

permitted to possess written legal materials, stationery, religious materials and leisure reading materials. Unlike general population prisoners, they were not permitted to possess electronic devices such as radios, televisions and electronic games. No prisoners at MSP are allowed access to the Internet, and access of all prisoners to computers is limited to library legal research terminals and word processors and computers used for educational programs. Prisoners in the SMU were allowed access to a special "thin client" computer terminal to perform legal research and could also use computers installed in some SMU cells for specific programs.

The Administrative Segregation policy sets forth the process afforded to a prisoner being placed or retained in administrative segregation. The policy provides for initial placement on EOS; this initial placement is reviewed by the prisoner's unit management team (in collaboration with the SMU management team if the prisoner is placed in the SMU) by the end of the next working day or within 72 hours, whichever is sooner. Prior to the expiration of the 72 hour period, a decision must be made to release the prisoner from EOS or place him in Administrative Segregation.

Initial placement on Administrative Segregation Status must be approved by the Commissioner or his designee. A Special Management Unit team must review the placement within seventy-two hours, and the prisoner must receive written notice of the review and an opportunity to address the reasons cited for continuing the placement. This process is repeated every 7 days for the first two months of placement and every thirty days thereafter. The decision to place or retain the prisoner in segregation may be appealed to the prison's warden. Retention in administrative segregation status for more than six months must be reviewed the Commissioner, and the Commissioner's review must be repeated every six months.

In Condon's case, his EOS status was reviewed the next day, March 6, 2014. He was in attendance at the review and stated that he was not aware of the reason for his being placed on EOS. The unit management team decided to retain him on EOS "pending IPS investigation." His placement was reviewed again on March 8; Condon attended the review and stated that he did not intend to harm any staff or inmates. The review team recommended placement on Administrative Segregation status, and their recommendation was approved by defendant Deputy Warden Troy Ross, acting as the Warden's designee.

Pursuant to the Department's policy, Condon's Administrative Segregation placement was reviewed by the unit management team on March 10, March 20, March 27, April 1, April 14, April 17, April 23, May 23, June 11, June 24, July 30, and August 29. Condon was present at most of these reviews and allowed to state his position at each review. Defendant Associate Commissioner Jody Breton, acting as the Commissioner's designee, conducted a six month review September 5.

As called for in Section I of the Administrative Segregation Review form, the factual basis for Condon's initial placement, as stated in the EOS Placement form is repeated in most of the review forms. The reason for retaining Condon in segregation after each review is stated in Section III. The reasons given were that Condon was a danger to other inmates and staff, that he threatened to kill the unit manager, and that he was held pending the IPS investigation. At one point (March 27), the unit management team recommended that Condon be released to population, but that recommendation was overridden by Defendant Ross. In April, Condon was retained pending evaluation for placement in the Administrative Control Unit,[2]

---

[2] Around this time, the prison was developing plans to open a special transitional unit within the SMU in which prisoners would be allowed more freedom and increased opportunities for programming and out-of-cell time. Due partly to the departure of Commissioner Ponte in March

Throughout Condon's time in segregation, defendant Bouffard considered him a continuing danger to staff. This belief was based on Condon's criminal history of violent murder, his history of misbehavior while previously at MSP, a report from federal prison authorities that Condon had murdered his cell mate in a federal facility, and Condon's own admission to Bouffard and others of that murder.

On May 16, 2014, defendant Bouffard formally requested that Condon be considered for an out-of-state transfer. Bouffard's request was directed to Scott McCaffery, the Department's Director of Classification, who served as the Commissioner's designee in arranging for the transfer of prisoners to other states under the Interstate Corrections Compact. Maine transfers prisoners to other states on a one-for-one exchange basis,[3] and it often requires some time to find a state interested in sending a prisoner to Maine in exchange for accepting a Maine transfer. McCaffery succeeded in negotiating a transfer of Condon to the Florida Department of Corrections in the fall of 2014, and Condon left the prison on October 28, 2014.

Once a prisoner is transferred to another state, the Maine Department of Corrections does not have any say in what facility of the transferee state the prisoner is placed in, or in any classification or security level decisions. The decision of the Florida Department of Corrections allegedly to place Condon in a maximum security facility and segregated confinement was made by that agency, without input from or consultation with the Maine Department of Corrections.

---

of 2014 and the appointment of a new commissioner, opening of the Administrative Control Unit was delayed, and it did not receive its first prisoners until November of 2014, after Condon had been transferred to Florida.

[3] Although Condon expressed a strong preference to be transferred back into the federal prison system, states placing prisoners in that system must pay the federal government to incarcerate them, whereas prisoner exchanges with other states under the Interstate Compact are at no additional cost to the sending state.

Condon's personal property was shipped to Florida shortly after he was transferred. At the time, the Department debited his account for the shipping costs ($156.76). Upon review, the Department reversed that decision and in November, 2017, reimbursed the amount previously taken.

In his Complaint, Condon alleged that his placement in the SMU and the process used to review that placement violated his rights under the Fourteenth Amendment. In addition, he claimed that, due to his placement in administrative segregation, he was treated differently from other prisoners formally charged with the disciplinary offense of "threatening" who would face a maximum period of 20 days in disciplinary segregation. Condon alleged that the effect of segregation on his mental status constituted cruel and unusual punishment in violation of the Eighth Amendment. Finally, he claimed that prison officials violated his First Amendment right by transferring him out of state in retaliation for filing a state court petition for judicial review regarding grievances about the administrative segregation review process.

Defendants moved to dismiss and the court, accepting the magistrate's recommended decision, allowed the case to proceed on plaintiff's claim that the administrative segregation process employed by defendants (as well as the taking of plaintiff's money for shipping his property) violated plaintiff's due process rights; and that defendants retaliated against the plaintiff by transferring him out of state because he filed a petition for judicial review.

## Argument

**1. Plaintiff's placement on administrative segregation status in the Special Management Unit for approximately seven months did not violate his right to due process under the Fourteenth Amendment.**

In *Sandin v. Conner,* 515 U.S. 472, 487 (1995), plaintiff inmate complained that he was not afforded proper due process when confined in disciplinary segregation for violating a prison regulation. The Court held that a prisoner's liberty interest protected by the Due Process clause "…will be generally limited to freedom from restraint which…imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. 472, 484. The Court also observed that, as opposed to punishment imposed by law on citizens who violate the law, punishment of incarcerated prisoners could be imposed to effectuate the goals of orderly prison management and prisoner rehabilitation. *Id.* at 485. The Court went on to hold that discipline imposed by prison officials in response to a wide range of misconduct falls within the expected contours of a sentence imposed by a court, and that confinement of an inmate to disciplinary segregation does not constitute the type of atypical, significant deprivation that would implicate a constitutional liberty interest.

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Court offered some guidance on the type of prison conditions that could constitute an atypical and significant hardship and thus give rise to a liberty interest protected by the Due Process Clause. In that case, prisoners in the Supermax unit of the Ohio State Penitentiary were kept in single cells and deprived of almost all human contact. They were allowed out of their cells into a small room for exercise one hour per day. Their placement was indefinite, and it was reviewed only annually. Placement in the Supermax unit also deprived prisoners of eligibility for parole. *Id.* at 214.

Although the Court found that these conditions, taken together, constituted an atypical and significant hardship, it held that the process afforded to these prisoners was adequate. The prison's policy provided that prisoners be given notice of the reason for placement, a fair opportunity for rebuttal at an informal hearing, and an opportunity to submit objections before a

final review.  *Id.* at 216.   The Court concluded that the "informal, non-adversary procedures" afforded by the state satisfied the due process requirements established by the Court's prior decisions.  *Id.* at 229.

In this case, conditions in the SMU at the Maine State Prison differ from those described in *Wilkinson*.  Prisoners in the SMU are allowed significantly more time out of their cells, including outdoor exercise.  They may converse with staff and other prisoners in the unit, and they are offered a variety of programs that provide further opportunities for personal interaction.  Their cells are similar to those in general population units.  Visits and phone calls are allowed weekly.  On the facts of this case, it must be concluded that Condon's confinement in the SMU for a period of approximately seven months was not such a departure from the ordinary incidents of incarceration as to implicate due process protections.

Even if Condon were entitled to due process in these circumstances, the process afforded to him compares favorably with the process found to be satisfactory in *Wilkinson*.  It is clear that he was tol at a very early stage why he was being placed in segregation, i.e., that he had threatened to kill Unit Manager Harris.  He actively participated in the regular reviews of his Administrative Segregation confinement and frequently appealed the decisions to maintain his segregated status.  In addition, he wrote frequently to the Warden and the Department's classification director.  Condon at first denied making such a threat and later conceded that remarks he did make about the unit manager may have been taken out of context.  Given the information obtained from a reliable informant, as well as prison officials' knowledge of Condon's extremely violent behavior in the past (including the murders of four people) and continuing threats to injure or kill staff, the defendants were justified in considering Condon a continued threat to the safety of individuals working at the prison.

**2. The Department's transfer of plaintiff to the Florida Department of Corrections did not violate his right to due process.**

In *Meachum v. Fano*, 427 U.S. 215 (1976), the Supreme Court held that a prisoner does not have a liberty interest protected by the due process clause in being housed in a particular prison facility, even where the transfer is to a facility where conditions are harsher. "That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules." *Id.* at 25. The Court has extended the ruling in *Meachum* to interstate transfers of prisoners. *Olim v. Wakinekona*, 461 U.S. 238, 245-246 (1983).

Because Condon had no interest protected by the due process clause in remaining in the Maine prison system or being transferred back to the federal prison system (a preference he repeatedly expressed), the defendants' decision to transfer him to Florida did not violate the Fourteenth Amendment.

The record also establishes that, once defendants transferred Condon to Florida, they had no further control or input into decisions affecting what facility he was placed in or his classification or security level.[4] Thus, on these facts, defendants' transfer of Condon to the Florida Department of Corrections did not violate his constitutional rights.

---

[4] Presumably, if the conditions of confinement in Florida constituted an extraordinary hardship, Condon could have brought an action against prison officials there for violating his rights under the Eighth or Fourteenth Amendments.

**3. Plaintiff's due process claim regarding deprivation of property is moot.**

Initially, it is questioned whether Condon was entitled to any due process protection in the circumstances of this case, where the Department took money from his prison account to pay for shipping his personal effects to Florida after he was transferred. Defendants recognize the First Circuit's decision in *Coombs v. Welch,* No. 15-1776 (1st Cir. May 9, 2016) to the effect that imposition on a prisoner of a $75 fine is sufficient to trigger due process protections; however, they note that the Supreme Court has apparently never ruled whether its decision in *Sandin v. Conner,* 515 U.S. 472 (1995) extends to the deprivation of a property interest as well as a liberty interest, and the matter is not settled; at least one court of appeals has ruled that a punishment including two separate fines failed to implicate a protected liberty interest and was "hardly atypical" such that no process was required before the punishment was imposed. *Hornsby v. Jones*, 392 Fed Appx. 653, 655 (10th Cir. 2010).

In any event, after reviewing the issue, the Department determined that it incorrectly deducted the funds from Condon's account and has now reimbursed them, thus rendering this claim moot.

**4. Defendants' decision to transfer plaintiff out of state was not in retaliation for his filing a petition for judicial review regarding his placement in administrative segregation.**

In order to proceed on a retaliation claim, a prisoner must allege facts sufficient to show that he engaged in protected activity, that prison officials took an adverse action against him, and that there was a causal link between the former and the latter. *Hannon v. Beard*, 645 F. 3d 45, 48 (1st Cir. 2011).

The adverse retaliatory action must be such as would deter a person of ordinary firmness from continuing to engage in the constitutionally protected conduct. *Brown v. Crowley*, 312 F. 3d 782 (6th Cir. 2002)

"It is only intuitive that for protected conduct to be a substantial motivating factor in a decision, the decision makers must be aware of the protected conduct." *Ambrose v. Township of Robinson, Pa.*, 303 F. 3d 488, 493 (3d Cir. 2002); *c.f., Mincy v. Chmielewski*, 2007 W.L. 707344, *6 (M.D. Pa.) (no evidence of causation where nothing in record showed that defendant prison officials were aware that prisoner had sent letters to outside agency and advocacy group); *Barnes v. County of Monroe*, 85 F. Supp. 3d 696, 732-733 (W.D.N.Y. 2015) (complaint failed to state claim of retaliation where plaintiff failed to allege facts showing that defendants had knowledge of protected activity.)

In this case, Condon cannot demonstrate that his transfer out of the Maine prison system was an adverse action. To the contrary, he wrote to both Warden Bouffard and Scott McCaffery on numerous occasions expressing his dislike for MSP and his strong desire to be transferred elsewhere. While he expressed a desire to be returned to the federal system, after agitating for months to be transferred, he cannot now claim that defendants acted with a retaliatory motive in transferring him to Florida.

Nor can he show that there was a causal link between the filing of his petition for review and the out-of-state transfer. The record establishes that defendant Bouffard requested that Condon be transferred some two months *before* Condon filed his petition. It logically does not follow that the decision to transfer Condon was motivated by an event that occurred after the decision was made.

**Conclusion**

For the reasons stated above, defendants request that the court grant this motion and enter judgment in their favor.

February 28, 2018                        /s/ James E. Fortin
                                                                         James E. Fortin
                                                                        Assistant Attorney General

Office of the Attorney General
Six State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8800

Certificate of Service

The undersigned hereby certifies that he served the above document by first class mail to the following:

John J. Condon
Zephyrhills Correctional Institution
2739 Gall Boulevard
Zephyrhills, Florida 33541

February 28, 2018                     /s/ James E. Fortin
                                                                          James E. Fortin
                                                                         Assistant Attorney General