UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JOHN JAY CONDON, | ) |
|         Plaintiff | ) |
| v. | ) Civil No. 1:16-cv-00372-JAW |
| RODNEY BOUFFARD, et al., | ) |
|         Defendants | ) |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**

Pursuant to F. R. Civ. P. 56(c) and Local Rule 56(b), defendants submit this statement of material facts as to which there is no dispute:

1. John Condon, a Maine Department of Corrections prisoner, was transferred from the federal prison system to the Maine State Prison (MSP) on April 20, 2012. *Affidavit of Troy Ross ("Ross aff."),* ¶ 2. This was at his request pursuant to a policy developed by Commissioner Joseph Ponte for the return of out-of-state prisoners. *Affidavit of Rodney Bouffard ("Bouffard aff."),* ¶ 3.

2. Condon was serving a life sentence for murders committed in Maine in 1982. *Id., Bouffard aff.,* ¶ 3.

3. Prior to being transferred back to MSP in 2012, Condon had spent several decades as a transferee to the federal system in various facilities. *Id.*

4. Condon admitted in letters to Scott McCaffery and Rodney Bouffard that he had killed a fellow prisoner in 1993 while incarcerated in a federal corrections facility. *Ross aff.,* ¶ 3, *Bouffard aff.,* ¶ 3.

1

5. When Condon was transferred back to MSP, he was advised that the prison would be monitoring his behavior closely and that, if his return to MSP did not work out, they would seek other placement for him. *Bouffard aff.,* ¶ 4.

6. On March 4, 2015, Antonio Mendez, Unit Manager of the Close Unit where Condon was housed, reported that he had been approached by a prisoner who said to him that John Condon had stated that he intended to kill Unit Manager Holly Harris, the co-manager of the Close Unit. *Ross aff.,* ¶ 4; *Bouffard aff.,* ¶ 6.

7. Due to Condon's history of violent behavior, prison officials took this threat very seriously and immediately placed Condon on Emergency Observation Status (EOS) in the Special Management Unit, the prison's segregation unit. *Ross aff.,* ¶5.

8. Condon's status was changed to Administrative Segregation shortly after that, and he was kept in the SMU because he represented a continued threat to the safety of the prison's staff. *Ross aff.,* ¶ 6; *Bouffard aff.,* ¶ 7.

9. Placement in EOS and Administrative Segregation is not dependent on whether a prisoner is charged with or found guilty of a disciplinary infraction. A prisoner can be placed and kept in segregation if he presents an immediate danger to staff or other prisoners without being charged with a disciplinary offense. This is what occurred in Condon's case. *Ross aff.,* ¶ 7.

10. Pursuant to the Department's Administrative Segregation policy, prisoners in segregation are provided living conditions approximately equal to those in general population. Cells in the SMU and in the Close and Medium custody general population units are approximately the same size. Cells in all three custody levels contain exterior windows and are equipped with tray slots in the doors, although the tray slots in SMU have an additional plastic

covering for security.  Prisoners in all custody levels may turn off their cell lights, but a low light level is always on to allow security staff to observe prisoners during counts.  Cells in all custody levels are similarly furnished.  *Ross aff.*, ¶ 9.

11.  Prisoners in SMU are allowed to speak with each other and with staff, although the opportunity for physical interaction between prisoners in SMU is more restricted than in general population units. *Ross aff.*, ¶ 10.

12. The Department's policy requires that prisoners in Administrative Segregation be allowed out of their cells a minimum of one hour per day, five days per week, for exercise, including outdoor exercise in fenced areas.   Around the time John Condon was housed in SMU, an increasing number of programs were introduced there and prisoners were allowed out of their cells to participate in many of these programs.  Depending on the number of programs that he participated in, a prisoner on Administrative Segregation status could be out of his cell an additional six and a half hours per week.  *Ross aff.*, ¶ 11.

13.  At that time, prisoners in Administrative Segregation were allowed one telephone call and one non-contact visit per week.  They were allowed to send and receive mail.  They were permitted to possess written legal materials, stationery, religious materials and leisure reading materials.  Unlike general population prisoners, they were not permitted to possess electronic devices such as radios, televisions and electronic games.  No prisoners at MSP at that time were allowed access to the Internet, and access of all prisoners to computers was limited to library legal research terminals and word processors and computers used for educational programs.  Prisoners in the SMU were allowed access to a special "thin client" computer terminal to perform legal research and could also use computers installed in some SMU cells for specific programs.  *Ross aff.*, ¶ 12.

14. Pursuant to the Department's policy, Condon's Administrative Segregation placement was reviewed by the unit management team on March 10, March 20, March 27, April 1, April 14, April 17, April 23, May 23, June 11, June 24, July 30, and August 29. Condon was present at most of these reviews and allowed to state his position at each review. Defendant Associate Commissioner Jody Breton, acting as the Commissioner's designee, conducted a six month review September 5. *Ross aff.,* ¶ 8, Exhibits 1 and 2

15. Fairly early on in Condon's confinement to the SMU, the prison's management, including Warden Bouffard, Deputy Warden Tausek and Deputy Warden Ross, discussed what to do with Condon. There was continuing concern that he presented an unacceptable level of danger to prison staff, but they were also concerned about the effects of an extended period in segregation. *Ross aff.,* ¶ 13; *Bouffard aff.,* ¶ 7.

16. Condon had repeatedly expressed his dissatisfaction with MSP and his desire to be transferred out of state, preferably back into federal custody. *Ross aff.*, ¶ 13; *Bouffard aff.,* ¶ 8.

17. Around that time, The Department was in the process of creating an Administrative Control Unit, which would act as a step-down unit for prisoners held in Administrative Segregation to allow them to transition back into general population. Condon was considered for transfer to the ACU in the spring of 2014; however, due in part to the departure of Commissioner Ponte and the appointment of a new commissioner, plans for the ACU were put on hold, and it did not open until November of that year. *Bouffard aff.,* ¶ 10.

18. In mid-May, Bouffard decided to request that Condon be transferred out of state. Ross agreed with the decision. *Ross aff.,* ¶ 13.

19. On May 16, 2014, Bouffard write to Scott McCaffery, the Department's Director of Classification, requesting that Condon be transferred out of state. *Bouffard aff.*, ¶ 9, Exhibit A; *Affidavit of Scott McCaffery, ("McCaffery aff.")*, ¶ 2.

20. Maine transfers prisoners to other states on a one-for-one exchange basis, and it often requires some time to find a state interested in sending a prisoner to Maine in exchange for accepting a Maine transfer. *McCaffery aff.*, ¶ 3.

21. Although Condon expressed a strong preference to be transferred back into the federal prison system, states placing prisoners in that system must pay the federal government to incarcerate them, whereas prisoner exchanges with other states under the Interstate Compact are at no additional cost to the sending state. For this reason, Maine tries to avoid transferring prisoners to the federal system whenever possible. *Id.*

22. After some time, McCaffery negotiated a transfer of Condon to the Florida Department of Corrections in the fall of 2014, and Condon left the Maine State Prison on October 28, 2014. *McCaffery aff.*, ¶ 4; *Ross aff.*, ¶ 14.

23. Once a prisoner is transferred to another state, the Maine Department of Corrections does not have any say in what facility of the transferee state the prisoner is placed in, or in any classification or security level decisions. The decision of the Florida Department of Corrections allegedly to place Condon in a maximum security facility and segregated confinement was made by that agency, without input from or consultation with the Maine Department of Corrections. *McCaffery aff.*, ¶ 5.

24. Bouffard was not aware that Condon had filed a petition for judicial review in state court in July 2014 regarding his confinement in the SMU. Bouffard was not aware of this petition when he requested that McCaffery arrange for Condon's transfer out of state, as that

decision was made two months before the petition was filed. Condon's petition for judicial review was not a factor in Bouffard's decision to request that Condon be transferred. *Bouffard aff.*, ¶ 11.

25. On December 15, 2014, the Department of Corrections debited Condon's trust account in the amount of $156.76 to pay for shipping his personal property to a prison in Florida. *Affidavit of Vonda Faxon,* ¶ 2.

26. On October 27, 2017, the Department sent Condon a check in the amount of $156.76 to reimburse him for the amount previously taken from his account. *Id.,* ¶ 3.

February 28, 2018                     /s/ James E. Fortin
                                      James E. Fortin
                                      Assistant Attorney General

Office of the Attorney General
Six State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8800

Certificate of Service

The undersigned hereby certifies that he served the above document and all attachments to it by first class mail to the following:

John J. Condon
Zephyrhills Correctional Institution
2739 Gall Boulevard
Zephyrhills, Florida 33541

February 28, 2018                     /s/ James E. Fortin
                                      James E. Fortin
                                      Assistant Attorney General