UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JOHN JAY CONDON, | ) |
|         Plaintiff | ) |
| v. | ) Civil No. 1:16-cv-00372-JAW |
| RODNEY BOUFFARD, et al., | ) |
|         Defendants | ) |

**AFFIDAVIT OF TROY ROSS**

TROY ROSS, being under oath, does hereby depose and say:

1. I am employed by the Maine Department of Corrections as the Deputy Warden for security at the Maine State Prison, and I was so employed in 2014. The statements in this affidavit are made from my personal knowledge and from information in records regularly kept by the Department of Corrections and available to me.

2. Prisoner John Condon was transferred from the federal prison system to the Maine State Prison (MSP) on April 20, 2012. Condon was serving a life sentence for murders committed in Maine in 1982. Prior to his return to Maine, Condon had spent several decades as a transferee to the federal prison system in various facilities.

3. I was aware from reviewing Condon's record that his initial crime involved the violent murder of three family members and that he had also been convicted of arson and theft. I was also aware that he had admitted to killing a fellow prisoner in a federal prison.

4. On March 4, 2015, Antonio Mendez, Unit Manager of the Close Unit where Condon was housed, reported that he had been approached by a prisoner who said to him that John

1

Condon had stated that he intended to kill Unit Manager Holly Harris, the co-manager of the Close Unit.

5. Due to Condon's history of violent behavior, we took this threat very seriously and immediately placed Condon on Emergency Observation Status (EOS) in the Special Management Unit, the prison's segregation unit.

6. Condon's status was changed to Administrative Segregation shortly after that, and he was kept in the SMU because he represented a continued threat to the safety of the prison's staff.

7. Placement in EOS and Administrative Segregation is not dependent on whether a prisoner is charged with or found guilty of a disciplinary infraction. A prisoner can be placed and kept in segregation if he presents an immediate danger to staff or other prisoners without being charged with a disciplinary offense. This is what occurred in Condon's case.

8. Condon's confinement in the SMU was reviewed periodically according to the Department's Administrative Segregation policy. I have attached a copy of the policy that was in effect at the time Condon was housed in the SMU. I have also attached a copy of the EOS and Administrative Segregation placement and review records concerning Condon's confinement in the SMU in 2014.

9. Pursuant to the Department's Administrative Segregation policy, prisoners in segregation are provided living conditions approximately equal to those in general population. Cells in the SMU and in the Close and Medium custody general population units are approximately the same size. Cells in all three custody levels contain exterior windows and are equipped with tray slots in the doors, although the tray slots in SMU have an additional plastic covering for security. Prisoners in all custody levels may turn off their cell lights, but a low light

level is always on to allow security staff to observe prisoners during counts.  Cells in all custody levels are similarly furnished.

10.  Prisoners in SMU are allowed to speak with each other and with staff, although the opportunity for physical interaction between prisoners in SMU is more restricted than in general population units.

11. The Department's policy requires that prisoners in Administrative Segregation be allowed out of their cells a minimum of one hour per day, five days per week, for exercise, including outdoor exercise in fenced areas.   Around the time John Condon was housed in SMU, an increasing number of programs were introduced there and prisoners were allowed out of their cells to participate in many of these programs.  Depending on the number of programs that he participated in, a prisoner on Administrative Segregation status could be out of his cell an additional six and a half hours per week.

12.  At that time, prisoners in Administrative Segregation were allowed one telephone call and one non-contact visit per week.  They were allowed to send and receive mail.  They were permitted to possess written legal materials, stationery, religious materials and leisure reading materials.  Unlike general population prisoners, they were not permitted to possess electronic devices such as radios, televisions and electronic games.  No prisoners at MSP at that time were allowed access to the Internet, and access of all prisoners to computers was limited to library legal research terminals and word processors and computers used for educational programs.  Prisoners in the SMU were allowed access to a special "thin client" computer terminal to perform legal research and could also use computers installed in some SMU cells for specific programs.

13. Fairly early on in Condon's confinement to the SMU, the prison's management, including Warden Bouffard, Deputy Warden Tausek and myself, discussed what to do with Condon. There was continuing concern that he presented an unacceptable level of danger to prison staff, but we were also concerned about the effects of an extended period in segregation. Condon had repeatedly expressed his dissatisfaction with MSP and his desire to be transferred out of state, preferably back into federal custody. In mid-May, Warden Bouffard decided to request that Condon be transferred out of state. I agreed with this decision.

14. Condon was transferred to the custody of the Florida Department of Corrections on October 28, 2014.

Signed under the penalty of perjury this 28th day of February, 2018.

_____/s/ Troy Ross_____
Troy Ross

Subscribed and sworn before me, this 28th day February, 2018.

__/s/ Gail Allen_____
Notary Public
My commission expires: January 28, 2014

4