# United States District Court
## District of Maine

John Jay Condon, ) Civil #:
Plaintiff )
v. ) 1:16-CV-00372
Rodney Bouffard, et al., ) JAW
Defendants )

## Opposition to Defendant's Motion to Amend Discovery Order

Plaintiff hereby moves to oppose Defendant's motion to modify portions of the Court's January 31, 2018, Order on Discovery Issues. These modifications are simply not acceptable. They are as a road under construction whereas the Court's order is a highway to the truth.

## Defendant's Response to Request for Production #1

The Court ordered the Defendant to produce the reports generated as a result of the Inner Perimeter Security (IPS) investigation which led to Plaintiff's seg-

PROVIDED TO ZEPHYRHILLS C.I. ON 2/28/18 FOR MAILING

regated confinement of almost two years. How did Defendant Ross respond to this order? He produced ONE prisoner "kite" (confidential messages prisoners write to one another or to staff) (Attachment 'A'); ONE confidential informant's (C/I) story to UM Mendez (Attachments 'B' & 'C') and a ONE sentence "summary" of the IPS investigation by Lt. Lidia Burnham (Attachment 'D'). The sentence, which contains only 15 words that apply to the investigation on Condon that Lt. Burnham supposedly headed as chief of the IPS team are as follows: "... and a copy of the note (Attachment 'A') that prisoner X sent to UM Allen talking about Condon." The rest of the sentence centers around Plaintiff inquiring about his books (this was DAY 41 of Plaintiff's confinement on Administrative Segregation (Ad. Seg.) and he had none of his personal property because it also had to be "investigated") and a money order Condon was missing. That's it. That's the IPS investigation, — all seven to eight months of it. A supposed investigation that Plaintiff sensed all along was being used as a ruse or a pretext to hold Plaintiff locked down as long as the defendants wanted to. Defendant Ross even admitted they had a "right" to do so when he stated in his motion to amend: "There is NO LIMIT on the length of (Administrative) segregation specified in the

-2-

POLICY..." (MOTION TO AMEND, p.1 over to p.2) (EMPHASIS MINE). THAT STATEMENT IS DAMAGING TO THEIR OWN DEFENSE AND PLAINTIFF BELIEVES IT WILL HOLD NO VALIDITY IN THE UNITED STATES FEDERAL COURTS. THE DEFENDANTS, INCLUDING A VERY UNINFORMED DEFENDANT JODY BRETON (WHO PLAINTIFF WILL HAVE MUCH TO SAY ABOUT AT TRIAL), AND THE VARIOUS MSP STAFF WHO PERFORMED THE VARIOUS AD. SEG. REVIEWS (ASR'S) CONDON SUFFERED THROUGH, - ALL USED THE EXCUSE THAT NO-ONE COULD MAKE ANY DECISIONS ON CONDON'S STATUS UNTIL THE IPS INVESTIGATION WAS COMPLETE. CONTINUALLY, THE PHRASE "PENDING THE RESULTS OF THE IPS INVESTIGATION" WAS USED, IN PLAINTIFF'S MIND, AS A STALL TECHNIQUE TO CONTINUE TO HOLD CONDON LOCKED DOWN WHERE THE ONLY LIBERTY HE HAD WAS A 6'X10' CELL AND AN OCCASIONAL "DOG RUN" OF ABOUT 15 YARDS LONG AND 6' WIDE UTILIZED AS "OUTSIDE RECREATION." ALL THIS WAS USED RIGHT UP TO THE 12th AND FINAL ASR CONDON HAD BEFORE HE WAS SUDDENLY SHIPPED TO FLORIDA. (PLAINTIFF'S AUGUST 7, 2017, MOTION TO SUPPLEMENT THE RECORD, ASR OF SEPTEMBER 29, 2014). "PENDING THE RESULTS OF THE IPS INVESTIGATION" WAS USED RIGHT UP TO DAY 209 OF CONDONS AD. SEG. CONFINEMENT.

THE ONLY INVESTIGATION LT. BURNHAM PERFORMED WAS TO SIMPLY FORWARD A COPY OF THE SAME KITE UNI ALLEN SENT HER (HE THINKING SHE WAS DOING THE INVESTIGATION ALSO)... AND THE

-3-

same one Defendant Ross produced here. (Attachment A). Opposing Counsel, in a letter to plaintiff (Attachment E)(dated 2/14/18) stated rather calmly that Lt. Burnham "did not create any written reports" (Attachment E, p. 1 ¶ 3). The once head of an investigative team that took over "seven months to complete" "did not create any written reports" when a life was supposedly at stake? No further comment is necessary here. Did any MSP staff member do any real investigation here? Plaintiff can't tell. And who took over Lt. Burnham's position as head of IPS when she was reassigned? Did he or she do any investigative work? If so, where is it? Where is the staff investigation of prisoner Condon's alleged threat to "kill" CCM Harris? All plaintiff sees here is one inmate kite from Small and a C/I's "confession" of something he "wanted" to "get off his chest."

When plaintiff was shipped to Florida because of the heat he was placing on the defendants and the local Knox County Superior Court with his Administrative Procedures Act lawsuit, the Defendants themselves, or through their subordinates, told the Florida D.O.C. officials that Condon did threaten staff and was assaultive to both staff and inmates alike. At a Florida D.O.C. classification hearing, Florida, now fearing for both the safety of

- 4 -

their staff and inmates, placed Condon in an extremely severe "Close Management" building for well over a year so they could observe the 67 year old Condon first hand at a safe distance. Here, Plaintiff most certainly suffered an atypical and significant hardship.

However, in a round about way, at least Defendant Ross through counsel told the truth here. Lt. Lisa Burnham essentially said there was NO investigation at all and 41 days into Plaintiff's confinement, Plaintiff has proof of that in an April 15, 2014, letter to him from Lt. Burnham (Attachment "F") which was in response to a letter Condon wrote her asking when the investigation would be over so he could obtain some of his property in confinement. She wrote back stating: "I am not aware of any pending investigation you are involved either."

Plaintiff was "Big Cheese" at MSP in 2012 when he returned given that he had just done 30 years in the "Big Time" feds. Plaintiff was a <u>prime candidate</u> to have a kite "dropped on" because the bigger & badder the reputation, the more likely the note <u>will be believed</u>. Weak or spiteful prisoners can and will drop notes on another prisoner for various

-5-

REASONS... MONEY OWED, FEAR, JEALOUSY, JOB CHANGE, REVENGE OR SOMEONE JUST WANTED THAT PRISONER OUT OF THE WAY.

UM ALLEN LEFT THE SMU RIGHT AROUND MID-MAY OF 2014 AND CAPTAIN HOWLETT REPLACED HIM. THEREFORE,

THAT ONE KITE CAME FROM INSIDE THE SMU MOST LIKELY FROM SOMEONE WHO WANTED TO GET OUT OF THE SMU AND HE COULD PICK NO BETTER TICKET OUT THAN PLAINTIFF CONDON. THIS TYPE OF PRISONER BEHAVIOR GOES ON IN EVERY PRISON AND JAIL ACROSS THE COUNTRY. THE KITE IN QUESTION HERE IS BLOWN WAY OUT OF PROPORTION TO THE FACTS OF WHAT CONDON ACTUALLY SAID... AND THAT WILL COME OUT IN BLACK & WHITE AT TRIAL.

THE REQUEST FOR PRODUCTION #1'S RESPONSE FROM THE DEFENDANT SPEAKS FOR ITSELF. THE DEFENDANTS ARE IN TROUBLE AND THEY KNOW IT. WHAT DEFENDANT ROSS PRODUCED HERE SUBSTANTIATES WHAT PLAINTIFF HAS BEEN BITING DOWN HARD ON FOR YEARS, AND THAT IS THERE WAS NO IN-DEPTH 200+ DAY OLD INVESTIGATION AND QUITE POSSIBLY NO INVESTIGATION AT ALL. DEFENDANT MAY BE TRYING TO USE MAINE LAW, STATUTES, POLICIES AND OTHER MAINE TECHNIQUES TO AVOID DETECTION, HOWEVER, THIS MATTER IS IN FEDERAL COURT.

-6-

## DEFENDANT'S RESPONSE TO REQUEST FOR PRODUCTION #2 & #3

The Defendant is having a difficult time with Plaintiff's Request for Production #2 and #3. Plaintiff believes Defendant is incorporating the Medium Security Prison (pop. 600-700, poss. more) with the Maximum Security Prison (pop. 300+/-). Plaintiff and the Court specifically stated MAXIMUM SECURITY PRISONERS (Court's Order, p.5, ¶2). The Medium and Maximum Security Prisons are on the same grounds, but separate, yet the address is the same. However, Defendant Ross was (and possibly still is) Associate Warden in charge of security of the Maximum Security MSP and he should be cognizant of the above. The Medium Security Prison(s) are a completely different playing field and throwing the Medium Security Prison at Warren into the mix just muddies the waters. Since the Court's order specifically stated Maximum, the Plaintiff will oppose Defendant's Response on that basis.

Defendant Ross was ordered to produce (between the dates of October 28, 2010, to October 28, 2014) the number of Maximum Security In-

- 7 -

mates who were held in Ad. Seg. for more than 30 days for threatening staff and the total duration of their stay there, inclusive of Disciplinary Segregation (D.S.) time. Using the same dates, the Court also ordered the Defendant to produce the number of Maximum Security inmates who were found guilty of threatening staff and the total amount of time each inmate spent in segregation.

First off, Defendant repeatedly states that the maximum period of D.S. time for a prisoner found guilty of "Threatening" is 30 days. That's wrong and it is important to note vis-a-vis the Court's order. The maximum amount of DS time for "Threatening" is 20 days, not 30 (see attachments 'G' & 'H', - MDOC Policy No. 20.1, - Prisoner Discipline). Defendant's main argument in support of his Motion to Amend is that to do so "would require a manual review of 2500 cases per year" (Defendant's Motion to Amend, p.2 ¶4). This isn't Florida, Texas or California. There is only one Maximum Security prison in the state of Maine and it is at Warren. And it is at Warren where plaintiff spent two years. There is only one building that holds the 300+ max. security inmates. How on earth could 300 inmates receive 2,500 Disciplinary/Administration Segregation

-8-

cases per year? That's eight disciplinary reports or Ad. Seg. cases written per inmate, per year. If what Defendant stated was true, a vast majority of the MSP population would be in the SMU at any one time... and the Special Management Unit can't hold them... it isn't that big. Plaintiff dismisses that excuse with no further comment. To further support his Motion to Amend, Defendant states that some prisoners may have been released and their "files would be archived at a different facility." (Motion to Amend, p. 2, ¶4). Searching the archives isn't hard at all, Plaintiff has done it with his own criminal case by U.S. Mail.

Defendant also argues that some prisoners may have been transferred "in which case their files would be transferred with them." (Ibid). Plaintiff believes that argument is faulty. Again, there is only one maximum security prison in Maine, therefore, transferees (with few exceptions for excellent or exceptional behavior) are not going to get transferred anywhere except out-of-state and to Plaintiff's knowledge, he would estimate that there is only 5-7 MSP inmates at any one time who have been transferred out of state to serve their Maine sentences. Further, any MSP inmate who has

-9-

been charged w/ threatening staff or sits in "SMU" "pending the results of the IPS investigation," most certainly will NOT be transferred to a lower security prison in MAINE.

Further, when an MSP inmate is transferred out-of-state, rest assured, MSP has a copy of that prisoner's file. To plaintiff, that is "Prison Administration 101." What if that file was burned up in a crash, stolen, lost, or fell out of the transferring plane, bus or van? Defendant(s) seem not to recognize or realize they are dealing with a plaintiff who has done over 35 straight years in prisons in Maine, California, Pennsylvania, Illinois, Colorado, Texas, Kentucky and now Florida, always as a Maine State Prisoner. Plaintiff may not be as well informed as the defendants administratively, but it isn't like he is unfamiliar either (prisoner plaintiff Condon is still considering requesting of this Court that he be designated as an expert witness on "prison life" at trial).

Lastly, the defendant's request that the Court modify its order "to allow for a random sample of perhaps 20 files located at MSP for each year of the period in question as prisoners placed in segregation for any reason." Plaintiff pro se is

-10-

baffled as to how to respond to this modification request without being offensive and therefore hurting his own case. Plaintiff simply does not see what this request has to do with "threatening staff." Therefore, plaintiff states that he adamantly opposes this request and considers it "not even in the same ballpark."

Plaintiff and the Court here are specifically after cases which involve an inmate threatening staff... not possession of contraband, rowdy behavior, out-of-bounds, failure to obey a direct order, stealing, etc., etc. Plaintiff is attempting to root out the truth here regarding similar cases that deal with threatening staff, not a watered-down generic sampling of prisoner disciplinary reports. Plaintiff has never sued anyone before these two years of the limited liberty he is allowed as a prisoner were suddenly yanked out of his life. We would not be here today if these Ultimate Decision Makers ("UDM") had treated Cowson like a man instead of placing him in a 6'x10' concrete cell and then hiding from him. They then compounded this type of "do as I please" behavior by telling untruths to the Florida Dept. of Corrections, who at a Due Process Hearing with real UDM's had no choice but to lock him up for what turned out to be another 400 odd days to find out if

-11-

HE WAS SAFE ENOUGH TO PLACE IN THEIR POPULATION (CONDON HAS NO PROPERTY OR LEGAL PAPERS TO DEFEND HIMSELF WITH AS THAT WAS STILL IN MAINE).

PLAINTIFF BELIEVES THE COURTS ORDER ON DISCOVERY ISSUES IS BEING GENTLE WITH THE DEFENDANTS HERE, THEREFORE, FOR ALL THE ABOVE REASONS, PLAINTIFF OPPOSES THE DEFENDANTS MOTION TO AMEND DISCOVERY ORDER.

DATED THIS 27th DAY OF FEBRUARY, 2018.

/s/ JOHN J. CONDON
JOHN J. CONDON
#148840 ZCI 2739
GALL BLVD. ZEPHYRHILLS, FLA
33541.

### Certificate of Service

THE UNDERSIGNED STATES THAT HE HAS MAILED A COPY, A CORRECT COPY, OF THIS DOCUMENT, POSTAGE PRE-PAID, BY U.S. MAIL TO:

JAMES E. FORTIN, AAG
OFFICE OF THE ATTY GEN
SIX STATE HOUSE STATION
AUGUSTA, MAINE 04333

FEBRUARY 28th, 2018      /s/ JOHN J. CONDON

-12-