UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JOHN JAY CONDON, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Civil No. 1:16-cv-00372-JAW |
| | ) |
| RODNEY BOUFFARD, et al., | ) |
| | ) |
| Defendants | ) |

### DEFENDANT TROY ROSS' RESPONSES
### TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

1. On March 5, 2014, Maine State Prisoner (MSP) John Condon, #2425, was placed on emergency observation status (EOS) within the special management unit (SMU) of MSP due to reports given to staff that he may be intending to harm or seriously injure a MSP staff member. Did you, acting as MSP Deputy Warden in charge of security back then, take part in the decision to place Condon on EOS?

ANSWER: No, the initial decision to place a prisoner on EOS status is made by the sergeant or unit manager.

2. Condon was subsequently placed on indefinite administrative segregation (Ad. Seg.) status "pending" the results of an inner perimeter security (IPS) investigation into the alleged threatening allegations. Interrogatory No. 2 asks you, Mr. Ross, when did the IPS team reach a conclusion (if they did) on the investigation of Condon and what was their conclusion?

ANSWER: My understanding is that the investigation conducted by the IPS team was limited in scope and did not affect our determination that plaintiff presented a significant danger to staff and other prisoners.

1

3. Were you part of the IPS investigation team that was doing the investigation on Condon?

ANSWER: No.

4. Who were the members of the IPS investigation team doing the investigation on Condon?

ANSWER: Defendant objects to this interrogatory on the grounds that the information sought is security or criminal investigative information made confidential by statute.

5. Since Condon was the main subject of the "Condon investigation," why didn't they interview or question Condon regarding the alleged threats he made?

ANSWER: I do not believe this was within the scope of their investigation.

6. You being the Deputy Warden of MSP in charge of security during the 33 weeks Condon eventually spent on Ad. Seg. status in MSP's MSU, how many times did you have a one-on-one with Condon where you could personally question him regarding these or this threatening allegation he was being confined on?

ANSWER: I do not know what plaintiff means by the term "one-on-one." I did speak casually with the plaintiff on a number of occasions when I made rounds in the SMU.

7. Why is it that, as of April 15, 2014, (a good 40 days into the IPS investigation on Condon), Lieutenant Lidia Burnham, then in charge of IPS, wrote to prisoner Condon admitting that "(I am) not aware of any pending investigations that (Condon is) involved either."[1] Why would she not be aware of an investigation taking place in the Department (IPS) she runs?

ANSWER: I don't know.

8. Evidently, Unit Manager Holly Harris was the alleged target of this alleged threat from Condon, correct?

ANSWER: Yes.

---

[1] See Appendix 'F' of Plaintiff's November 19, 2016 "Opposition to Defendant's Motion to Dismiss" for a copy of Lt. Burnham's letter to Condon.

2

9. Unit Manager Holly Harris actually conducted or took part in plaintiff's first administrative segregation review (ASR) on March 10, 2014, when the SMU team could of done the review (MDOC Policy No. 15.1, Section VI(C)(1) on Condon's future (liberty) status. It was prejudicial against Condon to have Holly Harris on the ASR Board that day to ascertain Condon's liberty status, wasn't it?

ANSWER: No.

10. According to MDOC Policy No. 15.1 (Administrative Segregation), Sect. VI, Proc (E)(7): "The CAO or designee, shall visit the living area where Ad. Seg. status prisoners are housed at least weekly." For the 235 days (March 5, 2014 to October 28, 2014) or 33 weeks that plaintiff Condon spent on Ad. Seg. Status, not once was he visited by that CAO at that time; Defendant Warden Bouffard. Plaintiff Condon remembers only seeing you once (early on and at a distance) while he was there. How many times during those 33 weeks would you say you acted as Defendant Bouffard's "designee" to fulfill the requirements of the above cited MDOC Ad. Seg. Policy No. 15.1?

ANSWER: I visited the SMU at least weekly, sometimes daily. In addition, Deputy Wardens Tausek and Walden also frequently visited the SMU.

11. Was the reason you and defendant Bouffard shied away from bringing a prison disciplinary board action against Condon on the charge of threatening was, because the MDOC Policy No. 2001 (prisoner discipline) classified "threatening" as a "Class B" offense and the maximum amount of time and disciplinary segregation status that could be administered (upon a filing of guilt) would of been only 20 days? (and thus Condon being "punished" would be at liberty to rejoin the MSP general population after serving the 20 days). Is that the reason you and defendant Bouffard did not bring disciplinary proceedings against Condon?

3

ANSWER: No. It was not necessary to bring a disciplinary proceeding against plaintiff to place him in Administrative Segregation. Plaintiff was convicted of murdering three people and admitted to killing a fourth person, a fellow prisoner. He threatened to kill members of the prison staff on two separate occasions and appeared capable of doing so. He was clearly a danger to staff and other prisoners.

12. If you answered "no" to above Interrogatory #11, then why didn't you and defendant Bouffard proceed with a disciplinary board action or 'trial' against Condon on the charge of "threatening"?

ANSWER: See preceding response.

13. Did you and co-defendant Bouffard "get around" having to restore Condon to the MSP general population after 20 days by setting up an "investigation" into the threatening allegations and then explaining to Condon on nearly every one of his ASR's that the reason he was being retained on Ad. Seg. status was because the ASR Board had to hold him there "pending the result of the IPS investigation" into whether or not he (Condon) actually threatened an absent staff member during an inmate cell rap session one evening? (said differently, was the "IPS investigation" just a pretext to hold Condon on Ad. Seg. status indefinitely?

ANSWER: No. See response to interrogatory 11.

14. Has Condon ever been convicted of assaulting a staff member during the course of his 35 straight years of imprisonment?

ANSWER: I don't know.

15. Condon often complained (inclusive of a formal grievance) that he wanted to "hear and be heard" by the ultimate decision maker (UDM) on his Ad. Seg. status and that he was not being afforded that opportunity. Regarding just who was or who were the UDM(s) on his liberty

status, Condon used the technique of deductive reasoning. He started by eliminating the Commissioner (or his designee) after day one of Ad. Seg. (MDOC, 15.1, Sect. VI, Proc. (A)(20) and only bring back solely the Commissioner at the six month mark of Ad. Seg. status. The various interchanging members of the ASR boards have UDM status for a short time . . . but their finding of "release or retain" on Ad. Seg. status can be immediately overruled once their decision reaches the desk of the CAO, or designee; (MDOC 15.1, VI(C)(6) and Section VI of the Ad. Seg. status review minutes). An example of that happened on Condon's 3rd ASR when the board released Condon back to general population (on paper) and you, defendant Ross, overruled that March 27th, 2014, ASR board decision and kept Condon "retained" on Ad. Seg. status. Using the deductive reasoning analysis, the above leaves just you (or the warden defendant Bouffard) as the ultimate decision maker on Condon's sought after liberty right. However, every one of Condon's 12 ASR's had your signature per those Section VI allowances (acting as the CAO's designee) which makes you the sole ultimate decision maker on Condon's liberty or Ad. Seg. "status." How many of Condon's 12 ASR's did you personally attend?

ANSWER: Defendant objects to the preamble to this question because it incorrectly states the facts and sets forth inaccurate conclusions. Without limiting or waiving this objection, defendant states: None.

16. All that being said and deductively proven (above), prisoner Condon still had the right to appeal (MDOC No. 15.1 Sect. VI, (C)(7) your Section VI ultimate decision. One would assume by American judicial standards that Condon's appeal(s) would go to a higher authority or at least to a different authority. But alas, no; donning your "appellate robe," in you step (again) as the appellate judge and, of course, you deny every one of Condon's appeals. Mr. Ross, does this

Maine State Prison Administrative Segregation Review process I've just described (above) appear to you to be in the spirit of traditional American jurisprudence?

ANSWER: Defendant objects to the preamble to this question because it incorrectly states the facts and sets forth inaccurate conclusions. Defendant objects to this interrogatory on the grounds that it seeks a legal opinion or conclusion.

17. Mr. Ross, it is apparent that you, acting as the CAO or Warden's designee, who never interviewed Condon, never visited him, never attended of Condon's 12 ASR's and never gave Condon a chance, during the 33 weeks he spent under your sole control (with the exception of day one and the six month Commissioner's review) in Ad. Seg. confinement, to plead his case before you or to any deliberate body in order to adjudicate the "threatening" charges levied against him so he could get on with is life within the parameters of the limited liberty he is afforded in MSP's general population. It is clearly apparent here that you acted as kind of a czar, or in fact, as an unapproachable, virtually unappealable and unchecked decision maker. Not only plaintiff Condon herein, but on any similarly situated MSP inmates who were placed on "Ad. Seg. status" during the period Condon spend locked-up there (and most likely before that and quite possibly right up this present date). Mr. Ross, is the above a correct assessment of your actions and powers in regards to the ASR procedure (at least) between the dates of March 5, 2014, to October 28, 2014?

ANSWER: Defendant objects to the preamble to this question because it incorrectly states the facts and sets forth inaccurate conclusions. Without limiting or waiving this objection, defendant answers: No.

18. If you answered that the contents of Interrogatory No. 17 is not a correct assessment of your duties, actions and powers during that period, please explain below why it is not.

ANSWER: See Policy 15.1, Administrative Segregation, for a description of the role of the chief administrative officer or designee.

19.     Perhaps you had "to do what you did" with inmate Condon because you received "orders" from someone else to "keep Condon locked-up" on Ad. Seg. status. If that was the case, who was that person?

ANSWER: That was not the case.

20.     Did Bob Costigan ever give you orders to "keep Condon locked up?"

ANSWER: No.

21.     Your signature appears at the bottom of the September 8, 2014, "Commissioner's six monthly review of Ad. Seg. Status" (MDOC Policy No. 15.1 (VI)(C)(14) (Attachment 'I'). See Appendix G of Plaintiff's Nov. 19, 2016, "Opposition to Defendant's Motion to Dismiss" for a copy of that Document). I claim that Defendant Deputy Commissioner Jody Breton not only erroneously performed that review according to Policy in effect at that time, but also did an egregiously inadequate undertaking of Condon's six month review. The policy and attachment cited above clearly state that it is the Commissioner's review and no-one else's. Further, where the Commissioner signs the review, it is clearly printed "signature, Commissioner" and no mention anywhere of "or designee" there or in 15.1(VI)(C)(14). She was so inept, and did such an inept job, she couldn't or wouldn't put a "reason" for her "decision" to approve Condon's solitary confinement for six months nor a "reason" to continue it. Question is to you, Mr. Ross, since your sent the Attachment 'I" (Commissioner's Six Monthly Review . . .) to the Commissioner and signed the decision by Deputy Commissioner Breton; the question is why did you allow her to perform the review? Why?

ANSWER: Deputy Commissioner Breton was designated by the Commissioner to perform the six-month review.

22. The 'problem of what" to do about Condon at one point was going to be solved by creating a new MSU "Administrative Control Pod or Unit" modeled around Condon where you and the other defendants felt you could keep him there pretty much indefinitely. Is that a true statement regarding Condon and this administrative control unit (ACU)?

ANSWER: No.

23. On June 6, 2014, Captain Howlett of the SMU handed Condon a document entitled "Notice of Administrative Control Status Unit Referral Review." The information contained in this document for consideration to place Condon in this new unit contained statements as such:

> "Prisoner Condon. . . was placed on administrative segregation for making serious threats towards staff. Confidential information was received (sic) by staff. . . that Condon. . . was planning to assault Unit Manager . . .This assault was supposed to cause serious bodily injury or death."

Mr. Ross, did you ever see this document?

ANSWER: Yes.

24. On May 21, 2014, did you sign, along with Deputy Warden Tausek and Defendant Warden Bouffard, an 'Initial Investigations" paper approving or disapproving the information contained in Interrogatory #23 (above) regarding Condon's referral to this newly developing administrative control unit?

ANSWER: I signed a Notice of Administrative Control Status Unit Referral Review which included a section entitled Internal Investigation.

8

25.     The small locked briefcase containing the "dossier" describing Condon for the Florida Department of Corrections (FDOC) that accompanied him on his transfer trip to Florida used affirmative & conclusive language (depicting Condon) such as:

(A)     "He was on segregated status due to his recent threats he made to staff and another inmate."
(b)     "A management problem due to assaultive behavior towards staff & other inmates."[2]

As you are aware, Condon never had any formal disciplinary proceedings initiated that led to a due process finding of guilt, period. Then, why was that misleading "conclusions of guilt" language used by you, Defendants Bouffard and Breton, to describe and portray MSP inmate Condon to the Florida Dept. of Corrections?

ANSWER: Defendants object to this interrogatory on the grounds that it is argumentative and states incorrect legal and factual conclusions. Without limiting or waiving this objection, defendant states: Assuming that the "dossier" referred to is the interstate transfer application, Defendant states that he did not participate in preparing this material.

26.     It is self-evident to the plaintiff that since you did not want to initiate disciplinary proceedings against him at MSP, where the maximum of disciplinary time in the SMU would only be 20 days, you the other defendants made it appear within the "dossier" on Condon as if you did . . . and left it up to Florida to inflict "thee" or further punishment. Is that a correct way to explain why Florida inflicted a further 438 days of harsh, segregated, disciplinary confinement on Condon?

ANSWER: Defendant objects to this interrogatory because it incorrectly states the facts and states incorrect conclusions. Without limiting or waiving this objection, defendant states: I do not know what Florida based their custody level determination on.

---

[2] See Appendix 'A' of Plaintiff's November 19, 2016 Opposition to Defendant's Motion to Dismiss.

27. By the use of the dossier language of "He was on segregated status due to his recent threats" and "a management problem due to his assaultive behavior" (all of which Condon maintained his innocence to during his 235 day ASR process in Maine), it appears to the innocent eyes of the Florida reader of the dossier (and to Condon himself) that there was a disciplinary proceeding against him "somewhere" in which he had no notice of, did not attend and had no opportunity to testify, call witnesses or present evidence on his behalf. When and where did this finding of guilt to threatening and assaultive behavior take place on Condon?

ANSWER: Defendant objects to this interrogatory on the grounds that it is argumentative and misleading. Without limiting or waiving this objection, defendant states: See response to Interrogatory11.

28. The information within the dossier supplied to the FDOC regarding Condon had to come out of the ASR's of Condon and the infamous "IPS investigation." Since you were the UDM on Condon's status throughout this 235 days in MSP's SMU / (See Interrogatory Nos. 15-17 herein) and all 12 ASR's he was subjected to (and this appeals) you are directly or indirectly, through your subordinates, responsible, along with Defendants Breton & Bouffard for the use of that false and misleading information which subsequently caused plaintiff Condon a further 438 days of very harsh, punitive, segregated confinement at the hand of the Florida Institutional Classification Team at Lake Butler Receiving & Medical Center who "sentenced" Condon to a year at the close management unit at Suwannee Correctional Institution. That 438 days was a direct result of the false information you and co-defendants Breton and Bouffard supplied Florida with. What is your reaction (in words) to the information provided herein Interrogatory No. 28? (How do you reply?)

ANSWER: Defendant objects to this interrogatory because it is factually inaccurate and argumentative and seeks an argumentative response. Without limiting or waiving this objection, defendant states: See responses to interrogatories 11, 25 and 26.

29. Getting back to the "Commissioner's Six Monthly Review of Ad. Seg. Status," did it ever occur to you that an outsider might seriously question an investigation (or whether or not an inmate said something "threatening" during a cell-rap session towards and absent staff member) that had taken 24 weeks with no results might just not be an investigation at all. . . But rather a pretext to hold a prisoner indefinitely on Ad. Seg. status? Don't you think a competent reviewer might just sense something was wrong here? (six months to determine whether a person "said something" or not. . .?) Doesn't that investigation appear to be absurdly lengthy to you?

ANSWER: Defendant objects to this interrogatory because it is factually inaccurate and argumentative and seeks an argumentative response.

30. After this bogus and blown out of all proportion "threatening" allegation against Condon blew any last criminal appeal he specifically came back to Maine State Prison for, he pleaded with Defendant Bouffard by letter (because Bouffard avoided Condon at every turn) and he pleaded with Deputy Warden Tausek and Classification Director McCaffery along with Commissioner Fitzpatrick to send him back to the Feds (U.S. Bureau of Prisons) where he had done the first 30 years of his sentence. Over and over again Condon requested to be sent back to the Feds where this whole thing could have been squashed. But you, Bouffard and Breton wouldn't. Why didn't you send Codon back to the Federal Bureau of Prisons where he was getting along excellently?

ANSWER: Defendant objects to this interrogatory on the grounds that it is premised on incorrect factual statements and conclusions, is argumentative and seeks an argumentative

11

response. Without limiting or waiving this response, defendant states: I believe Florida was the only jurisdiction that would accept the transfer of plaintiff.

Signed under the penalties of perjury this 24 day of October, 2017.

_____
Troy Ross

As to Objections:

_____
James E. Fortin
Assistant Attorney General