UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JOHN JAY CONDON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:16-cv-00372-JCN |
| | ) | |
| RODNEY BOUFFARD, et al., | ) | |
| | ) | |
| Defendants | ) | |

## MEMORANDUM OF DECISION ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In this action, Plaintiff, a former inmate at the Maine State Prison (the prison), alleges Defendants Rodney Bouffard, Troy Ross, and Jody Breton violated his constitutional rights under the Fourteenth Amendment Due Process Clause, the Fourteenth Amendment Equal Protection Clause, and the First Amendment Petition Clause. Plaintiff alleges Defendants, officials at the prison, subjected him to prolonged confinement in segregation and, after he petitioned for review of administrative action in state court, transferred him to the Zephyrhills Correctional Institution in Florida.

The matter is before the Court on Defendants' Motion for Summary Judgment. (ECF No. 70.) Following review and consideration of the parties' summary judgment filings and the record, the Court grants Defendants' Motion for Summary Judgment.[1]

---

[1] The parties consented to the undersigned to conduct any and all proceedings, to enter final orders and judgment, and, if necessary, to conduct a trial. (Consent to a Magistrate Judge, ECF No. 78.)

## I. Background

In response to Plaintiff's verified complaint (Complaint, ECF Nos. 1, 1-1, 1-2), Defendants filed a motion to dismiss (Motion, ECF No. 6), which the Court granted in part. (ECF Nos. 17, 37.) The Court dismissed Plaintiff's Eighth Amendment claim, but denied the motion with respect to Plaintiff's due process, equal protection, and retaliation claims.

Defendants contend the summary judgment record establishes that the conditions of confinement experienced by Plaintiff in the Special Management Unit (SMU), the prison's segregation unit, did not constitute an atypical and significant hardship; that the process regarding Plaintiff's administrative segregation complied with due process; that the law permitted Defendants to transfer Plaintiff to an out-of-state facility without providing notice or a hearing; that the funds taken from Plaintiff to pay the cost of shipping his property to Florida have been restored, mooting the property claim; and that Defendant Bouffard, the warden of the prison, made the decision to transfer Plaintiff to Florida before Plaintiff filed his request for judicial review of administrative action in state court, and thus Plaintiff cannot demonstrate a retaliatory motive for the transfer to Florida.

## II. Material Facts [2]

---

[2] The facts are derived from Defendants' statement of material facts (DSMF, ECF No. 71), affidavits and exhibits cited in support of the statement (ECF Nos. 71-1 – 71-7), Plaintiff's declaration in opposition of Defendants' motion (ECF No. 89), Plaintiff's response to Defendants' statement (PRSMF, ECF No. 90) and statement of additional material facts (PSAMF, ECF No. 90-1), declarations, interrogatory responses, and other exhibits cited in support thereof (ECF Nos. 90-2 through 90-7), Plaintiff's complaint signed under penalty of perjury (Compl., ECF Nos. 1, 1-2), and Defendants' Reply to Plaintiff's Statement of Additional Material Facts (ECF No. 93).

Plaintiff is serving a life sentence, imposed by the State of Maine, following his conviction in 1982 on three counts of murder. For most of the past thirty years, Plaintiff served his sentence in federal prison facilities. On April 20, 2012, at the request of the Maine Department of Corrections, Plaintiff was transferred to the Maine State Prison. (DSMF ¶¶ 1 – 3.) In letters written to administrators at the prison, Plaintiff admitted that he killed another prisoner in 1993 while incarcerated in a federal corrections facility.[3] (*Id.* ¶ 4.) Upon his arrival at the prison, Plaintiff was advised that his behavior would be monitored closely and that, if there were problems with his return to Maine, officials would seek another placement for him. (*Id.* ¶ 5.)

On March 4, 2014, a prisoner told Antonio Mendez, Unit Manager of the Close Unit to which Plaintiff was assigned, that Plaintiff expressed an intention to kill Holly Harris, another Unit Manager of the Close Unit. (*Id.* ¶ 6.) Plaintiff denies threatening to kill or otherwise harm Ms. Harris or anyone else. (PRSMF ¶ 6.)

Due to Plaintiff's history of violent behavior, prison officials immediately placed Plaintiff on emergency observation status (EOS) in the SMU. (DSMF ¶ 7.) Shortly thereafter,

---

[3] Plaintiff states that the prisoner he killed threatened him, and that after killing the prisoner, he "used that murder as a 'wedge' to maintain single cell status in the various federal penitentiaries [he] was housed in for the next 20 years." (Plaintiff's Summary Judgment Declaration ¶ 12, ECF No. 89.) He "continued to use that same 'wedge' … after [his] transfer back to Maine, mentioning it somewhat off-hand or as a kind of a 'footnote' in several letters to Maine officials, again to maintain a single-cell status. (*Id.* ¶ 13.) As for the report that he threatened a member of staff, Plaintiff states that he "was 'big cheese' at the MSP in 2012 when he returned given that he had just done 30 years in the 'big time' feds," and that he "was a prime candidate to have a kite 'dropped on' because the bigger & badder the reputation, the more likely the note will be believed." Additionally, "weak or spiteful prisoners can and will drop notes on another prisoner for various reasons," including "just [to get] that prisoner out of the way." Plaintiff states that "the kite in question here is blown way out of proportion to the facts of what [Plaintiff] actually said." (Plaintiff's Opposition to Defendants' Motion to Amend Discovery Order at 5 – 6, ECF No. 72.)

Plaintiff's status was changed to "administrative segregation," and he remained in the SMU until he was transferred to Florida on October 28, 2014. (*Id.* ¶¶ 8, 22.)

Under Maine prison policy in effect at the Maine State Prison, the placement of a prisoner in EOS and administrative segregation is not dependent on whether a prisoner is charged with or found guilty of a disciplinary infraction. A prisoner can be placed and maintained in segregation if the prisoner presents an immediate danger to staff or other prisoners even if the prisoner is not charged with a disciplinary offense. (DSMF ¶ 9.)

Conditions of confinement in the SMU

According to Defendants, the living conditions in the SMU are approximately the same as in the general population: cells in the SMU and in the close and medium custody, general population units are approximately the same size; cells in all three custody levels have exterior windows and are equipped with tray slots in the doors, although the tray slots in SMU have an additional plastic covering for security; prisoners in all custody levels may turn off their cell lights, but a low light level is always on to allow security staff to observe prisoners during counts; and cells in all custody levels are furnished similarly. (*Id.* ¶ 10.) Prisoners in the SMU are allowed to speak with each other and with staff, although the opportunity for physical interaction between prisoners in SMU is more restricted than in general population units. (*Id.* ¶ 11.)

Prisoners in administrative segregation are allowed out of their cells a minimum of one hour each day, five days per week, for exercise, including outdoor exercise in fenced areas. (*Id.* ¶ 12.) When Plaintiff was assigned to the SMU, an increasing number of programs were introduced, and prisoners were allowed to participate in many of the programs. Depending

on the number of programs in which a prisoner might participate, a prisoner on administrative segregation status could be out of his or her cell an additional six and a half hours each week. (*Id.*) Prisoners in administrative segregation were allowed one telephone call and one non-contact visit each week, were allowed to send and receive mail, and were permitted to possess written legal materials, stationery, religious materials and leisure reading materials. Unlike general population prisoners, they were not permitted to possess electronic devices such as radios, televisions and electronic games. Prisoners in the SMU were allowed access to a special "thin client" computer terminal to perform legal research and could also use computers installed in some SMU cells for specific programs. (*Id.* ¶ 13.)

Contrary to Defendants' characterization, Plaintiff contends prisoners remain in their cells for 23 hours each day, if not longer, and that the only outside recreation is a fenced in "dog run" measuring approximately five by fifteen yards. (Plaintiff's Summary Judgment Declaration ¶¶ 14 – 15, ECF No. 89.) Communication with other prisoners in the SMU occurs through each prisoner's steel cell door, which requires prisoners to "scream" to communicate. (*Id.* ¶ 15.) Canteen food purchases are not permitted. (*Id.* ¶ 19.) Plaintiff was provided a pen with which to write, but it was a "child's safety pen," and he did not have access to a chair or a desk at which to write or eat. (*Id.* ¶ 20.) Plaintiff asserts that his experience was exacerbated by the fact that he was not told he could be transferred, and that he worried he "would live out the remainder of [his] life in some obscure SMU cell." (*Id.* ¶ 26.)

Plaintiff asserts a prisoner in the general population has much greater liberty, including an open cell door for approximately 12 – 14 hours each day, the ability to leave the cell to obtain canteen items and access a microwave oven, socialize and play games with other

prisoners at a card table, take a shower, make a phone call, leave the unit to access outdoor recreational yards measured in acres, toss footballs or play softball, access a gym, visit a "well-stocked leisure library," use a word processor, get a haircut, attend club functions, attend religious activities, attend classes, attend musical functions, work in the green house, and eat alongside other prisoners. (*Id.* ¶¶ 15 – 18.)

Administrative segregation review

Plaintiff was in administrative segregation in the SMU for approximately eight months. Pursuant to the Department of Corrections' policy, a management team reviewed Plaintiff's placement in administrative segregation on twelve occasions in 2014: March 10, March 20, March 27, April 1, April 14, April 17, April 23, May 23, June 11, June 24, July 30, and August 29. (DSMF ¶ 14.) Plaintiff was present for and could participate in most of the reviews. (*Id.*) He was not allowed to attend on May 23 and June 24. (Plaintiff's Summary Judgment Declaration (PSJD) ¶ 23, ECF No. 89.) Defendant Breton, the Associate Commissioner, acting as the Commissioner's designee, conducted a six month review on September 5. (DSMF ¶ 14.)

At an early stage of Plaintiff's assignment to the SMU, the prison's management, including Defendant Bouffard, Deputy Warden Tausek and Defendant Ross, discussed Plaintiff's situation. The officials were concerned about the danger Plaintiff presented to prison staff, and the impact of an extended period in segregation. (*Id.* ¶ 15.) Plaintiff repeatedly expressed his dissatisfaction with the prison and, after a period of time in administrative segregation, he expressed a preference for a transfer out of state in federal custody. (*Id.* ¶ 16; PSJD ¶ 25.)

Transfer to Florida

In mid-May 2014, Defendant Bouffard, with Defendant Ross' agreement, decided to request that Plaintiff be transferred out of state. (DSMF ¶ 18.) On May 16, 2014, Defendant Bouffard wrote to Scott McCaffery, the Department's Director of Classification, requesting the transfer. (DSMF ¶ 19.) According to Plaintiff, he was never informed that Defendants were pursuing the transfer and only learned of it on the date he was transported out of the prison. (PSJD ¶ 26.) He asserts it would have "eased [his] mind considerably" if he had been informed. (*Id.*)

The Department of Corrections transfers prisoners to other states on a one-for-one exchange basis, and it often takes some time to find a state interested in such an exchange. (*Id.* ¶ 20.) When a state places a prisoner in the federal system, the state must pay the federal government to incarcerate the prisoner; when a state exchanges a prisoner for a prisoner in another state under the Interstate Compact, the state does not incur an additional cost. For this reason, the Department of Corrections attempts to avoid transferring a prisoner to the federal system whenever possible. (*Id.* ¶ 21.) Eventually, Mr. McCaffery arranged for Plaintiff's transfer to the Florida Department of Corrections. Plaintiff left the Maine State Prison on October 28, 2014. (*Id.* ¶ 22.)

Plaintiff asserts that he was subjected to more severe conditions for more than a year following his transfer to Florida. Plaintiff states that he has "no argument with the conditions of … SMU confinement," but the conditions in Florida "matched toe-to-toe with the conditions at the Ohio State Penitentiary mentioned in *Wilkinson v. Austin*." (PSJD ¶¶ 28, 30.) Plaintiff maintains Defendants are responsible for the difficulties he experienced in

Florida because he believes that statements Defendants made about his conduct caused the administrators of the Florida facility to place him under especially difficult conditions when he arrived. (*Id.* ¶¶ 31 – 32.) Defendants represent that they did "not have any say" as to where administrators in Florida placed Plaintiff. (DSMF ¶ 23.)

Retaliation Claim

Defendants assert Defendant Bouffard was not aware that Plaintiff had filed a petition for judicial review in state court in July 2014 regarding his confinement in the SMU; that Defendant Bouffard asked Mr. McCaffery to arrange for Plaintiff's transfer out of state two months before Plaintiff filed the petition; and that Plaintiff's petition for judicial review was not a factor in Defendant Bouffard's decision to request that Condon be transferred. (*Id.* ¶ 24.)

Shipping expenses

On December 15, 2014, the Department of Corrections debited Plaintiff's trust account $156.76 to pay the cost of shipping his personal property to the Florida facility. (*Id.* ¶ 25.) On October 27, 2017, the Department sent Plaintiff a check in the amount of $156.76 to reimburse him for the amount previously taken from his account. (*Id.* ¶ 26.)

### III. Discussion

#### A. Retaliation

Plaintiff claims Defendants transferred him to Florida because Plaintiff engaged in the protected activity of filing a petition for judicial review of administrative action in Maine state court. (Complaint ¶¶ 57 – 63.)

To establish a claim of First Amendment retaliation, an inmate must show (1) that the inmate engaged in conduct that is protected by the First Amendment; (2) that a defendant took adverse action against the inmate because of the inmate's protected conduct; and (3) that the adverse action would deter an inmate of ordinary firmness from exercising his or her First Amendment rights. *Hannon v. Beard*, 645 F.3d 45, 48 (1st Cir. 2011); *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003); *Thaddeus–X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999).

While the summary judgment record establishes that Plaintiff engaged in protected conduct, Plaintiff has failed to present any evidence that would contravene the record evidence that the person who made the transfer decision, Defendant Bouffard, was unaware at the time the decision was made, that Plaintiff had filed the petition in state court. Plaintiff, therefore, cannot demonstrate that the transfer occurred because of a protected activity and thus cannot prevail on his retaliation claim.

### B. Equal Protection

Plaintiff claims Defendants treated him "radically different from other MSP inmates similarly charged or situated" given the duration of his stay in the SMU and the fact that he never was adjudicated guilty of the threatening charge, which charge carried a maximum sanction of 20 days segregated confinement. (Complaint ¶¶ 54 – 55.)

"The Fourteenth Amendment's Equal Protection Clause prohibits a state from treating similarly situated persons differently because of their classification in a particular group." *Mulero-Carrillo v. Roman-Hernandez*, 790 F.3d 99, 105 – 106 (1st Cir. 2015), *cert. denied*, 136 S. Ct. 808 (2016). Generally, to state an equal protection claim, a plaintiff must allege facts that support a plausible inference that "compared with others similarly situated, the

plaintiff was selectively treated based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Id.* at 106 (quoting *Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 7 (1st Cir. 2001)). Absent such facts, decisions related to a person's rights, privileges, and benefits under state law require only a rational basis. *Id.*; *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The summary judgment record would not support a finding that Defendants selectively treated Plaintiff in any way based on his membership in a protected class, or that Defendants lacked a rational basis to transfer Plaintiff to another state, or to keep him in the SMU pending the transfer. To the contrary, the record lacks any evidence to suggest Defendants' conduct was unreasonable or the product of any impermissible motive. Plaintiff is serving a life sentence for a triple murder, spent nearly 30 years in federal penitentiaries, killed a fellow inmate, used the killing as leverage to obtain a single cell assignment after arriving at the Maine State Prison, and reportedly made a threat to kill a member of the staff at the Maine State Prison.

### C. Due Process

Plaintiff claims Defendants failed "to provide the opportunity for Plaintiff to 'hear and be heard' … on his status during all the ASR [Administrative Segregation Review] processes, inclusive of the Commissioner's Six Month[] Review," and thereby deprived Plaintiff of due process. (Complaint ¶ 51.)

In support of his claim, Plaintiff also alleged:

- On 3/27/14, a third ASR was held and this time the board decided to release Plaintiff back into the MSP general population.

- However, at the very bottom of the ASR status review minutes (MDOC form A-15.1-C-E, Sect. VI), there is a space where the Chief Administrative Officer or his designee has his own private review which can overrule the ASR Board's decision <u>without comment</u>.

- On 3/25/14, Defendant Designee Ross used this Sect. VI power to overrule the ASR Board's decision to release Plaintiff.

- There is <u>no</u> appeal to the Designee's decision and <u>no</u> opportunity for the Plaintiff to "hear and be heard" by Defendant Designee Ross.

(Complaint ¶¶ 15 – 18.)

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The analysis of a due process claim requires a court to consider "whether there exists a liberty or property interest of which a person has been deprived," and if so, "whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). "[T]he processes required by the Clause with respect to the termination of a protected interest will vary depending upon the importance attached to the interest and the particular circumstances under which the deprivation may occur." *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 320 (1985).

### 1. Whether Plaintiff Has Demonstrated a Liberty Interest

#### a. Liberty interest related to SMU confinement

"[W]hile persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant

rights." *Hudson v. Palmer*, 468 U.S. 517, 524 (1984). With respect to the Due Process Clause, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes,* 427 U.S. 236, 242 (1976).

As an inmate, Plaintiff's liberty interest is limited to avoiding conditions of confinement that impose an "atypical and significant hardship … in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Where the deprivation of liberty does not rise to that level, Defendants failure to provide procedural protections does not give rise to a constitutional violation. *Id.*

Defendants argue the record establishes that the conditions of confinement that Plaintiff experienced within the SMU do not constitute an atypical and significant hardship. In particular, they note Plaintiff could converse with staff and other prisoners and that he was not strictly confined to his cell for 23 hours per day. They observe the available programs permit SMU inmates to be outside their cells for an additional six and a half hours per week. (Motion at 9; see also Administrative Segregation Status Policy, Procedure E.2.o, ECF No. 71-2.) The record lacks any evidence that the programs were not available to Plaintiff.

Plaintiff maintains the conditions in the SMU constitute an atypical and significant hardship because he was denied communal dining and recreation, could not access an open unit with a television, canteen, and microwave oven, and could not enjoy various other amenities available to general population inmates. The denial of certain privileges available to the general population, however, does not constitute an atypical and significant hardship.

12

In *Hewitt v. Helms*, 459 U.S. 460 (1983), the Supreme Court held that the "narrow range of protected liberty interests" prisoners maintain upon lawful incarceration does not include an interest of confinement in the general population of a prison. *Id*. at 467. The Court wrote, "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Id*. at 468. Consistent with the Supreme Court's ruling, several courts have concluded that lengthy periods in segregation are not atypical and significant hardships where a legitimate disciplinary or security concern is implicated. *E.g.*, *Pona v. Weeden*, No. 1:16-cv-612, 2017 WL 3279012, at *5 (D.R.I. June 29, 2017), *rec. dec. adopted*, 2017 WL 3278874 (D.R.I. Aug. 1, 2017) (dismissing complaint involving 43 days pending investigation, followed by seven and a half months disciplinary sanction, and collecting cases).

Here, Plaintiff's conditions of confinement cannot reasonably be characterized as an atypical and significant hardship. That is, Plaintiff's time in segregation, for the reasons and under the conditions of segregation established on the record, does not and could not constitute an atypical and significant hardship.[4]

### b. Liberty interest in avoiding out of state transfer

The Supreme Court and the First Circuit Court of Appeals have held that interstate transfers of prisoners do not require a different analysis than intrastate transfers based simply

---

[4] Although the Court need not reach the issue given its finding that the conditions do not constitute an atypical and significant hardship, Defendants arguably are entitled to summary judgment on the issue based on qualified immunity. *See Perry v. Spencer*, No. 1:12-cv-12070, 2016 WL 5746346, at *16 (D. Mass. Sept. 30, 2016), *aff'd*, No. 16-2444, 2018 WL 4182452 (1st Cir. Aug. 29, 2018) (concluding it would not have been clear to prison officials at the time of the plaintiff's 15-month period in segregation (2010-2012) that the period of incarceration would have violated his constitutional rights).

on the fact that the prisoner is transferred to another state. *Olim v. Wakinekona*, 461 U.S. 238, 245 – 46 (1983) (involving transfer from Hawaii to California); *Sisbarro v. Warden, Mass. State Penitentiary*, 592 F.2d 1, 3 (1st Cir. 1979) (involving transfers from Massachusetts to Connecticut, then to Pennsylvania, then to Kansas). Simply stated, "[c]onfinement in another State … is 'within the normal limits or range of custody which the conviction has authorized the State to impose.'" *Olim*, 461 U.S. at 247 (quoting *Haymes,* 427 U.S. at 225). *See also Haymes*, 427 U.S. at 242 ("The [Due Process] Clause does not require hearings in connection with transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive."). To the extent, therefore, that Plaintiff contends the transfer to Florida deprived him of a constitutional right, Plaintiff's claim fails.[5]

### 2. Whether Procedures Were Sufficient

The process due a prisoner prior to the deprivation of a liberty interest related to his conditions of confinement is not determined by application of "rigid rules," but rather by a "framework to evaluate the sufficiency of particular procedures." *Wilkinson*, 545 U.S. 209, 224 (2005). The framework involves three factors: (1) the private interest affected by segregated confinement; (2) the risk that the process will result in an erroneous deprivation, and the probable value, if any, of a supplemental or alternative process; and (3) the government interest and the burdens associated with a supplemental or alternative process. *Id.* at 224 – 25 (citing *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976)).

---

[5] Plaintiff also failed to present any facts to support his contention that Florida subjected him to atypical and significant conditions based on information provided by Defendants.

### a. Plaintiff's private interest

Plaintiff's liberty interest in not being placed in segregation, "while more than minimal, must be evaluated … within the context of the prison system and its attendant curtailment of liberties." *Id.* at 225. The record reveals that the realities of prison and the prison system necessitated the "curtailment" of Plaintiff's interest. Plaintiff's violent history, as reflected by his life sentence on three counts of murder and by the fact he killed another inmate, his acknowledgement that he "was a prime candidate to have a kite dropped on him" because he was "bigger and badder" than the local inmates, and his reported threat to harm a member of the prison staff, are compelling factors in the evaluation of Plaintiff's interest.

### b. Process employed

The record establishes that Plaintiff was provided with notice of the reason he was placed in the SMU, that he had the opportunity to provide his position on the matter, and that the decision to keep him in the SMU was based on legitimate concerns about the safety of other inmates and prison staff. Notice of the factual basis for the SMU placement and the opportunity for rebuttal "are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Wilkinson*, 545 U.S. at 226.

In addition, after Plaintiff entered the SMU on March 4, 2014, a management team reviewed his placement on March 10, March 20, March 27, April 1, April 14, April 17, April 23, May 23, June 11, June 24, July 30, and August 29. (DSMF ¶ 14.) Plaintiff was present at most of these reviews, and he was allowed to state his position regarding the reason for his placement. (*Id.*) Plaintiff's absence from two of the reviews (May 23 and June 24) does not compromise the validity or sufficiency of the process. (PSJD ¶ 23.)

15

Through the process at the prison, Plaintiff was afforded "an informal, nonadversary review of the information supporting … administrative confinement, including whatever statement [the inmate] wished to submit, within a reasonable time after confining him to administrative segregation." *Hewitt*, 459 U.S. at 472. *See also id.* at 476 ("An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation.").

Plaintiff argues the process was deficient because the Chief Administrative Officer could and did overrule a favorable recommendation from the Administrative Segregation Review Committee. While the process permits the Chief Administrative Officer to overrule the Committee, the Officer's authority is not unlimited or unchecked. The policy requires a six-month review by the Commissioner, at which review the Chief Administrative Officer must articulate the justification for continued administrative segregation. (*Id.*, Procedure C.14.) The record demonstrates that the review occurred.

In sum, the record establishes that the process provided notice, an opportunity to be heard, and regular reviews of Plaintiff's status. The process was sufficient to minimize the risk of an erroneous deprivation of Plaintiff's liberty interest.

### c. The State's interest

The significance of Defendants' interest in maintaining order in the prison and in protecting the safety of inmates and staff cannot be seriously disputed. Similarly, the need to separate certain inmates from the general population to maintain that order and safety is also well-recognized. The process employed, which included notice, an opportunity to be heard,

16

and regular reviews (12 in 8 months), was reasonable and logically related to the state's interest in safety and maintaining order in the prison.

### d. Summary of evaluation of factors

None of the relevant factors supports Plaintiff's due process claim. The State's interest generally in maintaining the safety of inmates and prison staff is legitimate. In this case, the State's interest was particularly significant given Plaintiff's violent history, including in prison. Plaintiff posed a legitimate safety risk to the prison population and prison staff. Plaintiff's interest, while also significant, was appropriately addressed through the administrative process. The process by which Defendants decided to place Plaintiff in the SMU and the process by which Defendants decided to maintain him in segregation for eight months before his transfer were reasonable and consistent with the governing legal standard. As explained above, the process was sufficient to minimize the risk of an erroneous deprivation of Plaintiff's liberty interest. Given the risk posed and the process employed, Plaintiff cannot prevail on his due process claim. A contrary conclusion would be inconsistent with the "wide-ranging deference" to prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to ... maintain institutional security." *Whitley v. Albers*, 475 U.S. 312, 321–22 (1986) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)) (internal quotation marks omitted).

### 3. Plaintiff's Property Interest

Plaintiff complains Defendants withdrew $156.76 from his inmate account to satisfy the cost of forwarding his property to Florida. (ECF No. 1-2, ¶ 50.) He specifically requests, in his plea for relief, that any award include "the $156.76 Defendant took out of Plaintiff's

inmate account as a 'charge to send his property to him'." (*Id.* at 12.) The deprivation of money without adequate process can support a constitutional claim. *See Coombs v. Welch*, No. 15-1776 (1st Cir. May 9, 2016) (citing *Reynolds v. Wagner*, 128 F.3d 166, 179 (3d Cir. 1997)).

Insofar as Plaintiff seeks money damages for the temporary deprivation of his funds, he has not introduced any evidence to support a personal capacity claim against any of the defendants. Consequently, his claim is deemed an official capacity claim, presumably against Defendant Breton. An official capacity claim is effectively a claim against the State. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Because a state is not a "person" within the meaning of § 1983 and because § 1983 does not expressly abrogate the immunity provided to states under the Eleventh Amendment of the U.S. Constitution, section 1983 does not authorize a claim against the states. *Id.* at 64; *see also Nieves–Marquez v. Puerto Rico*, 353 F.3d 108, 124 (1st Cir. 2003) ("No cause of action for damages is stated under 42 U.S.C. § 1983 against a state, its agency, or its officials acting in an official capacity."). To the extent, therefore that Plaintiff seeks to recover damages based on the temporary deprivation of his funds, a damages remedy is, in any event, not available in an official capacity claim.

Finally, insofar as an official capacity claim could support prospective[6] equitable or injunctive relief consisting of the return of Plaintiff's money, because the Maine Department

---

[6] Only prospective injunctive relief is permissible with an official capacity claim. *Greenless v. Almond*, 277 F.3d 601, 607 (1st Cir. 2002).

In *Ex Parte Young*, however, the Supreme Court carved out an exception to Eleventh Amendment state immunity that allows federal courts to "enjoin state officials to conform their future conduct to the requirements of federal law," *Quern v. Jordan*, 440 U.S. 332, 337 (1979). *See also Green v. Mansour*, 474 U.S. 64, 68 (1985); *Edelman v. Jordan*, 415 U.S. 651, 664 (1974). The Court has described the

18

of Corrections refunded the money to Plaintiff, Plaintiff's claim for the return of his property is moot.

**IV.    Conclusion**

Based on the foregoing analysis, the Court grants Defendants' Motion for Summary Judgment. (ECF No. 70.) Judgment shall be entered for Defendants on all counts.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 21st day of September, 2018.

---

difference between permissible and impermissible relief as "the difference between prospective relief on one hand and retrospective relief on the other." *Quern*, 440 U.S. at 337.

*Whalen v. Massachusetts Trial Court*, 397 F.3d 19, 28 – 29 (1st Cir. 2005).